## Louisville & N. R. Co. v. Napier.

(Decided Dec. 18, 1936.)

ASHBY M. WARREN, J. MILLER WHITE and LOW & BRY-
ANT for appellant.

GOLDEN & LAY for appellee.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

This is an appeal from a judgment of the Bell
circuit court based on the verdict of a jury in the sum
of $7,500 in favor of appellee, Henry Napier, and
against the appellant, Louisville & Nashville Railroad
Company. Appellee was a passenger on one of ap-
pellant's trains on March 3, 1935, as the train was
proceeding from Pineville to Louisville. The train con-
sisted of an engine and five cars—a mail car, baggage
car, combination colored and smoking car, day coach,
and Pullman, in the order named. About 4 a. m. as the
head of the train emerged from a tunnel near Burr,
Ky., a rail broke, and the day coach and Pullman were
derailed, running over the ties for several hundred
yards before finally coming to a stop. Neither car was
overturned.

Napier was riding in the smoker, which was not
derailed. He testified that just before the accident he
started to go from his seat toward the front end of the
smoker to make a purchase from the news agent, and
had taken four or five steps, when there came a con-
siderable noise and the car pitched to the left, throwing
him with it. He says:

"It unbalanced me and I tried to throw my
knee into the seat to catch myself, two seats were
turned together, and I throwed my left knee at the
seat and I just brushed the edge of the seat and
as I went down I hit the bottom part of the seat
under the lower part of my stomach here on the
left side. * * * My right foot swung by it and I sank
on down with the bottom of the seat against my
ribs. * * * I started to get up and the train jerked
me back and the bottom of the seat hit the small
of my back behind me, and knocked the breath out
of me. * * * My side and back was hurting at the
time I got up out of the floor and the train was
stopping and when I started to get off I com-
menced getting sick at my stomach."

After some delay the train continued to Louisville minus the two rear cars. No one saw Napier fall, and he admits that he made no mention to any one of his alleged injuries during the remainder of the trip. The news agent testified that appellee waked him up *just before the derailment*; that the noise began after Napier awakened him; and that he sold Napier a bottle of Coca-Cola, which the latter drank before getting off the train after it had stopped. A number of witnesses testified that there was no violent jerking of the train even in the derailed cars.

Napier claimed that after he reached Louisville he examined himself and found a rupture on his left side "very near as large as an egg, and on the right side it was bulged up, and looked like the hide was bulged up maybe two or two and half inches long." He left Louisville the following night to return to Pineville, unaccompanied. He asserts that he spit up about half a teacup of blood while on the way home. After returning to Pineville, he continued his regular work as a lineman for the Kentucky Utilities Company for "about twelve days." On March 17, Napier says, the hernia on his left side broke out to a lump the size of his two hands. He says:

> "That Sunday morning I came down and helped them put up some disc connections at Cary and there was no heavy work more than climbing a pole 18 to 20 feet off the ground to the best of my knowledge, and my side hurt me all the time we were there and when I started back home there was a bridge there at Varilla and that broke out on me there."

He states that he was in the act of stepping over a wire about a foot above the ground when the hernia broke. He testified that he had had a rupture ever since he could remember and had worn a truss for years. In 1928 he was operated on for this trouble and secured an apparent cure, although all of the medical testimony indicated that in the case of a congenital hernia there was sometimes a recurrence of the trouble even where there had been no apparent strain or injury. Napier introduced his doctor, Dr. Mason Combs, as a witness, and the learned doctor testified at great length concerning the various ailments thought to be attributable

to the injury which appellee claims to have received, saying in part:

"My diagnosis at first was a recurring hernia— may I say of traumatic origin? I took the patient's history in part as to that—traumatic meaning of trauma or of bruise or force. The next thing that ensued following this, continuing my diagnosis, was neuro-circulatory-asthenia, otherwise known as effort syndrome, meaning concurrence, known also as 'Soldier's Heart,' and caused by a greater than normal amount of adrenalin chloride in the blood stream, the adrenalin coming from the adrenal or suprarenal glands just above the kidneys, and the adrenal glands arising from the same embryonic cell from which the sympathetic nervous system arises, the sympathetic nervous system being that part of the nervous system which is composed of the ganglia or nerve stations along in front of the spinal cord in that portion running from the first dorsal vertebra to the last lumbar vertebra. This sympathetic nervous system goes to all the abdominal and all thoracic viscera, and, as stated, arises from the same cell in uterine life or before birth or in the formation of a child that the adrenal glands arise from. For this reason they are closely related to the adrenal glands that are called the power house of the system. And in the presence of neuro-circulatory-asthenia they are always putting out more power than the sympathetic nervous system can use. Then the next was hyper-thyroidism, which resulted from a hyper-sensitivity of the thyroid gland to a presence of an over-plus of adrenalin in the blood stream. This results in an over-activity of all the musculature in the entire body, including the stomach and the intestines, that is supplied with sympathetic nerves. Also the autonomic nervous system is undoubtedly affected and speeded up and we have what is known as hyper-thyroidism or hyper-kineticism, which is an overaction of the adrenal glands, the sympathetic nervous system, the thyroid and the anterior lobe of the brain."

The claimed excess of adrenalin chloride in appellee's blood stream is apparently considered by the doctor to be the moving factor resulting in both the

neuro-circulatory-asthenia and the hyper-thyroidism. He details pain, hemorrhage, fear and worry, inhalation, anesthesia, infection or breaking down of the proteins, and asphyxia as the only causes of neuro-circulatory-asthenia and, by process of elimination, he gave "the breaking down of the proteins" as the cause of appellee's ailments. The doctor estimated from his records that he had made approximately 392 examinations for thyroid trouble since January 1, 1929, but never before had a case where hyper-thyroidism was caused by a hernia. He explained this by saying that traumatic hernia is extremely rare and "unless the patient has been gored by a bull or kicked by a mule we hardly ever have one." In the learned doctor's opinion, it must have been a "breaking down of the proteins" which caused both the neuro-circulatory-asthenia and also the hyper-thyroidism. On cross-examination the doctor testified regarding Napier's injury that he "looked on it as a congenital hernia at first." He described the "breaking down of the proteins" to be a tearing of the muscles or to be a result of the tearing of the muscles—"the proteins are the amino acid of which the muscle is composed." Nowhere does the doctor say that he actually found a tearing of the muscles or of the left inguinal ring. He seems to base his conclusion of traumatic injury upon appellee's statement that he spit up some blood on the way home from Louisville to Pineville.

A second doctor who examined Napier with Dr. Combs agreed with his conclusion that appellee was suffering from hyper-thyroidism and "cardio vascular circulatory neurasthenia," which he said was the same thing as neuro-circulatory-asthenia. Asked for his opinion in response to a lengthy hypothetical question, he said: "Well, I believe the injury could be the cause of the entire trouble."

Opposed to this testimony, the appellant railroad company introduced the testimony of four doctors. Dr. C. B. Stacy testified that Napier called him on March 17, the date appellee says that the hernia on his left side broke out, and that when he went to visit him he found that his intestines had slipped down on the left side of the abdomen, or the left inguinal ring, and that appellee was suffering a considerable amount of pain. The doctor manipulated and pushed the intestinal contents

back up into the abdomen, which, he says, relieved the pain. He took a history of Napier's case and advised him to have the hernia repaired. He says that Napier gave him no history of having vomited any blood, nor did he mention any injury to his back. He says, that, from the examination he made of Napier, he believes that he would have discovered any visible injury to his back had one existed. Appellee agreed to undergo an operation, but before the time arrived for going to the hospital he talked to Dr. Combs, who advised him against this procedure and took over his treatment. Dr. Stacy testified that appellee had no evidence of any hyper-thyroid condition at the time when he examined him. Asked if at that time there were any evidences of neuro-circulatory-asthenia, he said:

"I might say this in this regard. As a general rule, take these people that are born with weakened parts of the body, which is shown in this case by the fact that he has a weak abdominal wall, instead of a big, strong, robust fellow, you generally find a fellow who is not particularly unhealthy but is not up to par all around; and when you say neuro-circulatory-asthenia you mean a general body weakness, which is the simplest way we can put it. If he were not that way, at least to a relative extent, he would not have had the first abdominal weakness, a weakness of the musculature and the result over the body as a whole."

He testified that he did not consider that there was any relationship between a hernia, or between an accident such as Napier claimed to have suffered, and hyper-thyroidism. He stated that he had assisted Dr. B. P. Jones, who was designated by the court to make an examination of Napier after the case was called for trial, and that there was absolutely no evidence of any hyper-thyroidism on that examination.

Dr. Jones testified that appellee had no clinical symptoms of hyper-thyroidism, and he confirmed Dr. Stacy's statement that tests performed showed no evidence of this condition. He found "that he had some diseased condition of his teeth, several extractions, and a red condition of the interior part of the throat." He further said that:

"Over the region of the inguinal ring on the left

side I found a scar and about the middle of the scar was a loose or relaxed condition, and he told me he had been wearing a truss. I did not find any tumor formation there in the way of a hernia.''

Dr. Jones said that he did not know much about neuro-circulatory-asthenia. Dr. C. K. Brosheer qualified as an expert on hernia, and stated that there was no connection between hernia and hyper-thyroidism. When he was asked to state the causes of neuro-circulatory-asthenia, he asked: ''How long do you want to be at it?'' Told by the court to make it as short as he could so that it would be plain, he said: ''I can't explain it and you can't understand it.'' The court asked that he ''put it in a brief way,'' and he responded: ''You can't do it. The doctor that springs it on you don't know and I don't.'' The record of his testimony further shows:

''Q. 25. State whether or not an injury in the region of the hips or in the small of the back down there that would create a discoloration of the skin here about the size of your hand, but the patient would be able to go on about his duties &c.—would that be calculated to cause neuro-circulatory-asthenia? A. A condition severe enough to crush the body and break the bones and seriously destroy the soft tissues might produce a condition which would lead to it.''

Dr. Jacob Schultz testified that there was no connection between a hernia and hyper-thyroidism or neuro-circulatory-asthenia. He further testified that an injury sufficient to produce a traumatic hernia would cause severe shock accompanied by an accelerated heart-beat, together with chills.

Returning to the testimony of plaintiff's medical experts, it will be observed that their conclusion in regard to the neuro-circulatory-asthenia and the hyper-thyroidism is based entirely on the theory of a ''breaking down of the proteins'' resulting from a traumatic hernia. Even these witnesses, however, say that traumatic hernia is accompanied by excruciating pain. On this score we have the appellee's own testimony to the effect that he made no complaint to any one of his condition after his alleged fall. He calmly drank a bottle of Coca-Cola, and then got off the train to examine the

results of the wreck, and, following this, went on to Louisville, and then returned to Pineville, and worked for almost two weeks at his regular occupation, which included climbing poles of the Kentucky Utilities Company. He did not even call a doctor during this period, and it was not until almost two weeks after the accident that the hernia broke out. We have the further fact that appellee's own doctor says that when he first treated him he considered that the hernia was congenital rather than traumatic, an error in judgment which does not seem consistent with the comparison of a traumatic hernia to the injury received from being gored by a bull or kicked by a mule. We have the further undisputed testimony that appellee is suffering from infected teeth, and the admission by his own expert that an infection may cause the very condition which they ascribe to "the breaking down of the proteins." We have the testimony of Dr. Stacy that appellee had no evidence of hyper-thyroidism at the time when he treated him immediately following the alleged accident, together with the testimony that the examination made at the time of the trial failed to show any such condition, either clinically or as a result of tests, and the further testimony that the neuro-circulatory-asthenia was a congenital condition which must have existed before the alleged accident ever occurred. It is obvious that the testimony in regard to these complications of diseases is so highly speculative and vague as to be without probative value.

Accepting the fact that the evidence was sufficient to establish negligence on the part of the appellant and to take this question to the jury together with the question of whether or not this negligence was the proximate cause of the injury suffered by appellee, we are still confronted by the proposition that the evidence is altogether too uncertain to justify or support a verdict for the substantial sum of $7,500. Napier's own medical witness testified at the trial that "his real pain may be about at an end at this time." Certainly the evidence falls far short of sustaining a recovery of $7,500 merely on the basis of the pain which appellee suffered. It is only on the theory that the injuries are permanent that we could hope to sustain the verdict.

This court has held time and time again that where, as here, a verdict is so large that it could be upheld only

if the injuries are permanent, the proof of permanency must be both positive and satisfactory. Herndon v. Waldon, 243 Ky. 312, 47 S. W. (2d) 1047 (and cases there cited). As we have endeavored to demonstrate in our resume of the evidence above, the proof of injuries in this case contains so many inconsistencies and so much that, on its face, necessarily is pure speculation as to leave no doubt that it is neither positive nor satisfactory as to permanency, or, indeed, as to the proximate cause of much of Napier's alleged trouble. The verdict is flagrantly excessive and cannot be allowed to stand.

Other points are argued, and counsel on both sides have referred to matters occurring since the trial and not in the record. We have determined this case on the record properly before us. All other questions than the one here considered are reserved.

Judgment reversed.