**STATE of Missouri, Respondent,**

v.

**Rollin Eugene SMITH, Appellant.**

No. 51904.

Supreme Court of Missouri,
En Banc.

Nov. 13, 1967.

Rehearing Denied Dec. 11, 1967.

52

Norman H. Anderson, Atty. Gen., John H. Denman, Asst. Atty. Gen., Jefferson City, for respondent.

Newmark & Baris, Irl B. Baris, St. Louis, for appellant.

HOUSER, Commissioner.

Rollin Eugene Smith, a clerk in a bookstore on McPherson Avenue in St. Louis, has appealed from a workhouse sentence of 30 days and a fine of $500 imposed upon him following a jury verdict of guilty of possessing obscene matter (the book "Candy") with intent to sell, in violation of § 563.280, V.A.M.S.[1]

We have jurisdiction of this appeal, notwithstanding it is a misdemeanor case, because the construction of the state and federal constitutions is necessary to its determination. Constitution of Missouri, 1945, Art. V, § 3, V.A.M.S.

On March 31, 1965 police detective Edwin Kuster entered the bookstore and purchased from defendant a paperback version of Candy, published by Brandon House. Asked if he was familiar with the book defendant answered that he had read it and found it very amusing. The detective left the store, returning shortly thereafter with another detective. The officers placed defendant under arrest. He was then asked if there were other copies of the book in the store. Answering in the affirmative he showed the detectives where they were. The detectives confiscated 8 additional copies of the book.

Appellant relies upon twelve points of error.

1. "Every person who knowingly shall * * * have in his possession, with intent to sell or circulate * * * any obscene, lewd, licentious, indecent or lascivious book, * * * or other publication of indecent, immoral or scandalous character, * * * shall, on conviction thereof, be fined not more than one thousand dollars nor less than fifty dollars, or be imprisoned not more than one year in the county jail, or both * * *."

## NON-OBSCENITY AS A MATTER OF LAW?

Appellant urges that the court erred in not ruling as a matter of law that Candy is not obscene and is constitutionally protected under state and federal constitutional provisions relating to freedom of speech and of the press and due process of law.[2]

"The right of free speech is not an absolute right at all times and under all circumstances." The right of freedom of speech "is subject to the state's right to exercise its inherent police power." State v. Becker, 364 Mo. 1079, 272 S.W.2d 283, 288, 289. "[O]bscenity is not within the area of constitutionally protected speech or press." Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498, followed in State v. Vollmar, Mo. Sup., 389 S.W.2d 20, 27. The Supreme Court of the United States accepts it as a postulate that " 'the primary requirements of decency may be enforced against obscene publications.' " Kingsley Books, Inc. v. Brown, 354 U.S. 436, 440, 77 S.Ct. 1325, 1327, 1 L.Ed.2d 1469.

The constitutional issue having been raised, it is our duty to reach an independent judgment on the mixed question of law and fact whether Candy is obscene. State v. Vollmar, supra, 389 S.W.2d, l. c. 27, 28 [18].[3] A definition of the term "obscenity" is a prerequisite. In 1965 this Court in Vollmar, following the 1957 opinion of the Supreme Court of the United States in Roth v. United States, supra, applied the definition of obscenity concurred in by a majority of the justices of that Court,

namely, that "Obscene material is material which deals with sex in a manner appealing to prurient interest" and applied the test approved therein, "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." In subsequent decisions individual judges or several but less than a majority of the Court have expressed views which, if eventually adopted by a majority of the Court, will add further refinements and qualifications to the Roth definition. "Two members of the Court have consistently adhered to the view that a State is utterly without power to suppress, control or punish the distribution of any writings or pictures upon the ground of their 'obscenity.' [Ginzburg v. United States, 383 U.S. 463, 476, 482, 86 S.Ct. 942, 950, 953, 16 L.Ed.2d 31 (dissenting opinions); Jacobellis v. State of Ohio, 378 U.S. 184, 196, 84 S.Ct. 1676, 1682 (concurring opinion); Roth v. United States, 354 U.S. 476, 508, 77 S.Ct. 1304, 1321 (dissenting opinion).] A third has held to the opinion that a State's power in this area is narrowly limited to a distinct and clearly identifiable class of material. [Ginzburg v. United States, 383 U.S. 463, 499, and n. 3, 86 S.Ct. 942, 956 (dissenting opinion), referring to hardcore pornography.] Others have subscribed to a not dissimilar standard, holding that a State may not constitutionally inhibit the distribution of literary material as obscene unless '(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relat-

---

2. "That no law shall be passed impairing the freedom of speech, no matter by what means communicated; that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty; * * *." Constitution of Missouri, 1945, Art. I, § 8. "Congress shall make no law * * * abridging the freedom of speech, or of the press, * * *."

Constitution of the United States, First Amendment.

"* * * nor shall any State deprive any person of * * * due process of law * * *." Constitution of the United States, Fourteenth Amendment.

3. See also Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (footnote 378 U.S., l. c. 188, 84 S.Ct., l. c. 1678); United States v. West Coast News Co., 6 Cir, 357 F.2d 855 [3].

ing to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value,' emphasizing that the 'three elements must coalesce,' and that no such material can 'be proscribed unless it is found to be *utterly* without redeeming social value.' A Book Named 'John Clelands' Memoirs of a Woman of Pleasure' v. Attorney General of Com. of Massachusetts, 383 U.S. 413, 418–419, 86 S.Ct. 975, 977–978 [16 L.Ed.2d 1]. Another Justice has not viewed the 'social value' element as an independent factor in the judgment of obscenity. Id., at 460–462, 86 S.Ct. 975, 998–999 (dissenting opinion)." Quotation from Per Curiam opinion of the Supreme Court of the United States in Redrup v. New York, May 8, 1967, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515.

■ While on matters involving the construction of the federal constitution the controlling decisions of the United States Supreme Court must be followed, this Court is not required to apply every test devised by each of the nine justices. Our duty in this respect is discharged when we apply the test on which the Court has spoken with the authoritative voice of a majority. In the case of Candy, however, it is a matter of no consequence whether we restrict our consideration to the test of Roth, or go further and apply the "patently offensive" test or the "social value" test. Under neither of the three tests is Candy entitled, as a matter of law, to constitutional protection. Under all three of the tests the conclusion is impelled, by a reading of the book, that we cannot say as a matter of law that Candy does not make a strong, urgent and demoralizing appeal to prurient interest in sex; or that the material is not an affront to contemporary community standards relating to the description or representation of sexual matters and therefore is not patently offensive;

and that the material is not utterly without redeeming social value.

■ Considering the book as a whole, and not by one or a few isolated words, phrases, paragraphs or chapters, from the standpoint of the average person, applying contemporary community standards,[4] we cannot conscientiously say as a matter of law that the dominant theme of the material does not appeal to prurient interest in sex. It begins, mildly, with a professor pretending to drop his lecture notes, and, in retrieving them, showing his backside to the class, "which laughed appreciatively." It ends, disgustingly, with Candy standing before a Buddhist statue, meditating on the tip of its nose. Struck by lightning, the statue falls half burying Candy and a dung-covered "holy man," who are thrown together, with Candy's shift forced above her waist and her shapely bare legs locked about the holy man's loins in such juxtaposition that he has an erection and his "taut member" eases into her "tight little lamb-pit." She is pinioned in that position by the slipping of the statue into such a position that the tip of its nose slips into Candy's "marvellous derriere." She relaxes and begins to enjoy both penetrations when she suddenly realizes that the "holy man" is her father. In between these two rectal ruminations there are, in the paperback edition, 189 pages of salacious smut. Reasonable minds could find that Candy is an episodic account of rotten erotica; a sick saga of sex; a series of sensational sex encounters connected by a thin tissue of so-called "plot" which serves as the excuse to hold it together. The beginning chapters set the dominant theme of the book, which a jury could find is a direct appeal to prurient interest in sex, namely, that for a delightfully appealing young girl with every physical attraction to give herself fully to the satisfaction of the sexual needs of every male with whom she comes in contact is not only a duty but

4. which we have held does not mean the local area involved, but relates to

a national standard, State v. Vollmar, supra, 389 S.W.2d, l. c. 27 [17].

a beautiful and thrilling privilege. This theme is introduced in the setting of an attempt at seduction by Candy's professor, whose blandishments bring her to the yielding point when they are interrupted by a male student. The professor and the boy go into an adjoining room where Candy later finds them naked, dancing about wildly, flailing each other with wet towels, "Moaning and sobbing, their bodies reddened and welted." Next, Candy takes the initiative and arranges to satisfy the gardener's sexual needs in a sultry and highly provocative bedroom scene. Final consummation of the sex act (the "terrible thrust to the hilt") is interrupted by Candy's father, who attacks the gardener. The latter nearly brains him with a trowel. At the hospital, under her father's bed, Candy takes care of her Uncle Jack's sexual needs until interrupted by a nurse, who in turn is ravished in a tumultuous melee. Preceding their trip to the hospital a series of conversations with Candy's Aunt Livia are related. This particular account is unleavened obscenity of the most degrading nature. This bit of immoral writing is interlaced with and adorned by every conceivable four-letter Anglo-Saxon word of the level of the sewer. At this point in the book the subject of masturbation is treated by introducing a young doctor who advocates masturbation as the only sex mode that permits complete fulfillment and mental health, and blames heterosexual lovemaking as the root of all neuroses. Candy faints in a doctor's office and is stripped of her clothing. What could be denominated the dominant theme of sexuality is pursued via a cunning description of the digital exploration of the nude girl, followed by the sticking of numerous pins in her buttocks. Next, Candy's Aunt Livia, a beautiful woman, is portrayed, naked and unconscious, strapped to an operating table. The doctor, sitting in a chair, sticks numerous pins in her buttocks, while he briskly abuses himself sexually until he screams triumphantly, dropping to the floor to lie "utterly spent, face down and apparently unconscious." Candy goes to New York. There she encounters a hunchback who is agitating his hump against a tree on a street corner. She invites him to her apartment where she plies him with food, drink and sex in the form of minutely described, franker-than-frank perversion, followed by sadomasochistic beating and flagellation, ending with a revolting scene in which Candy in a transport of passion madly tries to get the hunchback's hump into her labias. The scene shifts to a bar where a bartender tells of the gamut of emotions which crossed the face of a "hefty babe" seated on a barstool as she gradually sank down toward the floor while the stool and "about a foot of the legs of the stool" slipped or pushed "right up into her thing." Now comes a gynecologist who meets Candy in a New York bar and takes her to the men's room for an "examination," which turns out to be a massage of her clitoris, followed by an act of perversion which he practices upon her. On the way to the police station one of the officers in the police car tears open his fly and forces Candy's hand inside his trousers. The police car, swerving to avoid a truck, runs into a bar in which there are 250 homosexuals. A stranger, helping her escape from the authorities, takes her to a camp of Utopians in Minnesota, where in an atmosphere of "spiritualism" she is taught "Cosmic Rhythm," among other things. There she engages in erotic scenes of sexual intercourse. The descriptions are graphic and detailed. The male and female parts, the preparation and approach, the act and the orgasm are all written in a manner obviously calculated to arouse lascivious longing and to excite lecherous desire. Bounced off to Calcutta when she becomes pregnant, Candy receives letters the contents of which appear to constitute hardcore pornography in its most vulgar form. She flies to Tibet, where the Buddhist idol affair climaxes the book, which ends with the words: "GOOD GRIEF, IT'S DADDY!"

### The prurient interest test

Roth defined prurient as "itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire; curiosity, or propensity, lewd. * * *" Roth also referred to the Model Penal Code statement that a thing is obscene "if, considered as a whole, its predominant appeal is to prurient interest, i. e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. * * *"[5] This book engagingly describes this "precious," "darling" girl with "exquisitely warm round thighs," and gives exotic close-ups of her personal responses to sexual stimuli, her seductions, acts of intercourse, orgasms and her feelings during these experiences. Her private parts are described in loving, affectionate language. Special attention is given to her clitoris, which is frequently called by its right name but sometimes referred to by the more familiar diminutive "clit," and its manual massage by the several men with whom she is thrown. The flyleaf of the paperback edition describes the book as scandalous, shocking, and the "bawdiest book of this era," which has "the critics raving and the censors roaring." Vividly portrayed scenes are wittily written for the transparent purpose of arousing the passions appealing to the physical appetite, stimulating sexual desire and titillating sexual response in the reader. A jury could find that the dominant theme, indeed the flesh, arteries, blood and backbone of this book is an appeal to prurient interest in sex. The average person reading the erotic and sensual descriptions of the sexual life of this beautiful young creature will be filled with "uneasy desire," "lascivious longings" and a "shameful interest in nudity and sex."

Appellant points out that the state introduced no evidence that the appeal of Candy was to the prurient interest in sex, whereas appellant called numerous expert witnesses[6] who indicated that they did not consider that this is the appeal of Candy; who found Candy acceptable by "contemporary community standards." The teacher with an M.A. degree felt that the prurient effect gained by suggestion in a pornographic work is immediately destroyed as soon as humor enters in, and that Candy is a funny book and not obscene. He was prepared to say that distribution of Candy to young people would be "healthful." A Catholic priest who had not read the book opined that sex matters can be spoofed without appealing to the prurient interest and that the purpose of prurient writing is to inflame a man or woman to have impure thoughts. The psychiatrist considered that the book does not violate the accepted national standard of sex and morals. The anthropologist-sociologist said that Candy is well within the national contemporary community standards of conduct and morality; that the average person could have no adverse effect after reading Candy.

Expert testimony that a publication conforms to general community standards and is not obscene is not within the proper scope of expert testimony. State v. Vollmar, supra, 389 S.W.2d 29 [25]; State v. Becker, supra. In Vollmar it was reasoned that judges and jurors have knowledge concerning the general community standards relating to moral conduct and obscenity; and that in the field of obscenity the average citizen is as capable of judging a publication "as an alleged expert." In assessing whether a publication is obscene or whether it conforms to contemporary community standards of decency and morality the courts are concerned with the dominant theme as it appears to the *average* person—not as it may be consid-

---

5. § 207.10(2), Tent.Draft No. 6, 1957.

6. Two English professors, an M.A. and a Ph.D., an Episcopal priest, a Catholic priest, a Presbyterian minister, a Ph.D. who is a sociologist-anthropologist, and a psychiatrist.

ered by the small segment of the population represented by the "experts" who testified for appellant—sophisticated, cultivated, highly educated, widely traveled and worldly-wise members of the intelligentsia whose judgment as to the reactions of the *average* person who reads Candy is of questionable, if any, value. This book may appeal to the intellectual elite on an intellectual plane. The erudite and sophisticated may be cultivated to the point where they are not affected by erotica or may be impervious to the storms of aroused passion. We are confident, however, that the *average* person is not so finely tuned or so smugly insulated.

New Jersey considers the testimony of experts as appropriate in the area of contemporary community standards and customary limits of candor. G. P. Putnam's Sons v. Calissi, 86 N.J.Super. 82, (1964) 205 A.2d 913 [3]. Even there, however, the danger of blindly accepting the conclusion of the expert in this area of law is pointed out. The following quotation from People v. Fritch, 13 N.Y.2d 119, 243 N.Y.S.2d 1, 192 N.E.2d 713, by the New York Court of Appeals (1963), approved by the New Jersey Superior Court, represents our views on this question:

"It does not follow * * * that because an alleged work of literature does not appeal to the prurient interest of a small group of intellectuals that it is not obscene under the prurient interest, or for that matter any other legal test of obscenity. This would permit the substitution of the opinions of authors and critics for those of the average person in the contemporary community. The fact that a few literary figures have commented favorably on this book and have lent it their prestige does not expunge from its pages the flagrantly obscene and patently offensive matter which dominates the book as a whole. * * *

"A book may not be judged by its cover, its introduction or the laudatory comments contained in the publisher's blurbs— rather it must be judged by its actual contents. It requires little perception or imagination to conceive that the actual contents of a book may completely negate these testimonials and indorsements. Nor does the fact that the author enjoys wide acclaim as a writer control, for the book must be judged, not by the reputation of the author, but by what he writes in it. To hold otherwise would give recognized writers the freedom to traffic in obscenity at will under the guise of creating a work of art. This court will not adopt a rule of law which states that obscenity is suppressible but that well-written obscenity is not."

### The patently offensive test

■ A jury could find that unadulterated smut, fornication, masturbation, flagellation, perversion, sodomy and incest, sprinkled throughout with obscene and profane gutter words, well-laced throughout with lust and shockingly frank word pictures of the private parts of men and women; vividly portrayed scenes of an obscene, repulsive, loathsome, grotesque and bizarre nature, wittily contrived for the obvious purpose of administering a shock to the reader, are "so offensive on their face as to affront current community standards of decency," which is the definition of patent offensiveness given in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed. 2d 639. Appellant contends for a clean bill of health for Candy on the ground that other books as bad or worse have been adjudged not obscene by the courts. He cites "Tropic of Cancer," "Lady Chatterly's Lover," and "Fanny Hill," as examples of books which have received the stamp of approval by federal courts. (We are cited to no controlling decision which holds as a matter of law that Candy is not obscene, and we have found none.) As indicated in Jacobellis, supra, the ultimate decisions in obscenity cases must be made on a case-to-case basis. It must be recognized that no two books are alike. Each must be judged on its own merits or demerits. We cannot decide the issue before us by

comparing Candy with some other book. The test is not whether Candy is less objectionable than Fanny Hill, et al. The test is whether as a matter of law *Candy* is nonobscene. Ours must be an independent determination as to the propriety of Candy under the governing rules. We must adhere to our own judgment of Candy rather than rely upon the judgment of other judges passing on other books.

In his claim that the book does not go beyond the customary limits of candor in description or representation appellant, conceding that Candy has "some vivid descriptions," seeks justification on the ground that the book would have had a completely different meaning without the candor; that it was "absolutely necessary" to the development of the author's theme. He excuses the use of "certain four-letter words" on the ground that their use is a "necessary technique in the development of the author's satirical thesis." Material that ordinarily would be classed as obscene does not go through a filter and come out "smelling like a rose" simply because the author takes the material and grossly exaggerates and distorts it out of all reasonable proportion, or presents it in an unusually and outlandishly abhorrent manner. We cannot subscribe to a rule that obscenity is bad but that massive obscenity to the nth degree is permissible.

### The social value test

While as indicated only three of the justices have laid this down as a requirement we will weigh Candy in the light of the pronouncement of Brennan, J., in a book named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1, that a book cannot be proscribed unless it is found to be utterly without redeeming social value; that this is so even though it has prurient appeal and is patently offensive, and that each of these three criteria must be applied independently.

Appellant urges that the following evidences the social value of Candy: that it has been given open and widespread distribution; that six months before defendant's arrest 112,000 copies had been sold; that it headed the best seller list for many weeks; that critics have acclaimed it; [7] that the United States Attorney General ruled that it was not a proper subject for federal prosecution; and that the book was said to have social value by the literati who testified in this case. The testimony of the latter, distilled, was that Candy is a work of literary art; that it tells a story in an accepted literary sense and has wit and contemporary literary value; that it is a good book, an important book, a healthy antidote to other kinds of literature available to society; a very healthy addition to the standards of morality; that they had recommended it to friends and colleagues and to college students with the statement that they might get some enjoyment out of it; that there is no relationship between the book and sexual crimes or acts of sexual perversion. They consider that it is a satiric attack upon currently held notions or attitudes toward sex found in modern society as reflected in some contemporary writing; that it holds up to ridicule certain sexual attitudes that people have and "the contemporary attitude of the softheaded liberal"; that it spoofs, ridicules and lampoons distorted views of sex, portraying what is thought to be love but which is not; that by employing satiric exaggeration and grotesque puffing up of sex the author "attacks false idealization of certain attitudes towards sex which are to be found in modern society"; that it is a humorous book, "a very funny book," a subtle and hilarious satire on sex and attitudes toward sex. The experts compared Candy with the works of Chaucer, Shakespeare, Rabelais, Swift, and

---

7. Critics have said that it is a work of brilliance and solid worth; that we need it; that it should be a good shot in the arm to the American reading public; that it is "a wonderful break for everybody."

on the contemporary scene, D. H. Lawrence and Henry Miller. A Presbyterian minister compared Candy with the gospels, claiming that Candy uses the same style of approach in spoofing immorality as Jesus did in laughing at the people of his time and their social pride.

In our judgment reasonable minds could differ on the question whether Candy has any redemptive artistic, literary, social or scientific value. The explanations of the experts in their efforts to substantiate their conclusions to the contrary are vague, intangible, and convey nothing meaningful. If Candy "tells a story in an accepted literary sense" it can be viewed as a story of sensuality and wild abandon to sexual impulse and the pleasures of passion. If it is a work of art it might be regarded as a work of art in evoking titillating sexual response. Those who would hold this publication not obscene as a matter of law on the ground that it is socially valuable as a satire on currently held notions of sex may do so on the ground that it rebukes and criticizes an evil and therefore tends to bring about an improvement in the evil condition.[8] If the saving grace of this book is the salvation of its readers from exaggerated ideas about sex its methodology is inconsistent with and foreign to its objective. The accentuation of prurient appeal by exaggeration imparts no social value to pornography.

In our opinion black is black and when it appears before your eyes it cannot be converted into white by saying so, no matter how many say so or who they may be. The plain truth is that Candy communicates nothing of value. The constant repetition of one sensual scene after another and the liberal use of lascivious and provocative language transmits no social theme of significance or worth. We agree

with the Attorney General of Missouri that the story does not purport to advocate any idea of redeeming social value; that there is no serious effort to portray the reality of cultural or social conditions of even the most neurotic or sordid portion of the population (Judge Wyzanski's comment in declaring Lust Job obscene, in Books, Inc. v. United States, 5 Cir., 358 F.2d 935, 936); that no development of character in any meaningful way is attempted nor has the author attempted any character insight that might be valuable to the reader; that no moral is shown. A jury could find that its effect on society as a whole and on the average person in society can only be deleterious and harmful.

Candy is a satire; concededly there are appeals to the sense of humor through gross exaggeration and grotesque distortion. Generally it is well-written and in places witty. But obscenity is still obscene, notwithstanding it is humorous, well-written, witty and in form satiric. Obscenity does not go through a purifying metamorphosis by being presented in a certain literary form or style or by injecting humor into the narrative. We endorse the views expressed in People v. Bookcase, Inc., 40 Misc.2d 796, 244 N.Y.S.2d 297, 300:

> "Filth, even if wrapped in the finest packaging, is still filth. 'Charm of language, subtlety of thought, faultless style, even distinction of authorship, may all * * * be present and the book be unfit for dissemination to the reading public. * * *' * * * 'This court will not adopt a rule of law which states that obscenity is suppressible but that well-written obscenity is not.' "

Justice Clark, in his dissenting opinion in a book named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General

---

8. "Satire" is defined in Webster's Third New International Dictionary as "topical literary composition holding up human or individual vices, folly, abuses, or shortcomings to censure by means of ridicule, derision, burlesque, irony, or other method sometimes with an intent to bring about improvement * * * a branch of literature ridiculing vice or folly * * * raillery used to convey rebuke or criticism: caustic comment: irony. * * *"

of the Com. of Massachusetts, supra, put it this way, 383 U.S., 1. c. 450, 86 S.Ct. 1. c. 993:

"If a book deals solely with erotic material in a manner calculated to appeal to the prurient interest, it matters not that it may be expressed in beautiful prose. There are obviously dynamic connections between art and sex—the emotional, intellectual, and physical—but where the former is used solely to promote prurient appeal, it cannot claim constitutional immunity."

The fact that this book sold like hotcakes and led the best seller list for weeks does not prove it has social value but comes closer to proving that there is in this country a ready market for pornography and that morbid interest in sex is being commercially exploited.

Nor does the acclaim of a few critics establish its social worth or purge from its pages the obscenity and shockingly offensive matter with which it is permeated. People v. Fritch, supra.

In our considered judgment we cannot declare as a matter of law that Candy is not obscene, because it is plain that any jury could find that it is obscene, under all three of the proposed tests.

### SCIENTER?

Conceding that the state showed that he read the book, appellant contends that scienter was not sufficiently shown because the state failed to prove that he *knew that the contents of the book were obscene.* Appellant cites no case so holding. The adjudicated cases are to the contrary. In Vollmar, supra, we held that possession of some knowledge of the nature of the contents of the publication was sufficient to constitute scienter. In People v. Harris, 192 Cal.App.2d Supp. 887, 13 Cal. Rptr. 642, 645 [5], it was held that proof

of scienter "does not mean that the People must prove that the defendant considered the books obscene. Scienter is knowledge of the contents of the books [citing Smith v. California, infra]." People v. Williamson, 207 Cal.App.2d 839, 24 Cal.Rptr. 734, 738: "It is necessary that it be established that defendant knew the contents of the book but it is not necessary to show that he knew it was obscene. * * * It having been established that defendant had read the book and therefore had knowledge of its character, the jury could infer from such knowledge a lewd intent on the part of defendant." Bunis v. Conway, 20 A.D.2d 961, 249 N.Y.S.2d 700, 701: "The scienter required is *knowledge of the content of the book* by one accused of violating the section." (Our emphasis.) And see City of Chicago v. Doe, 47 Ill. App.2d 460 (1964), 197 N.E.2d 711, 715 [5].

Scienter within the meaning of § 563.280 means knowledge of the contents of the publication. Scienter was twice so defined in Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205. Referring to the Los Angeles ordinance under review the Court said: "The definition included no element of scienter—*knowledge* by appellant *of the contents of the book*— * * *." 361 U.S., 1. c. 149, 80 S.Ct. 1. c. 216. Later: "Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was *aware of what a book contained,* despite his denial." (Our emphasis.) 361 U.S., 1. c. 154, 80 S.Ct., 1. c. 219. To exonerate a bookseller on the basis of his testimony that he knew the contents of the book but did not know it was obscene would for all practical purposes make successful prosecution impossible, for it would put acquittal in the mouth of the defendant in every case. People v. Finkelstein, 28 Misc.2d 771, 218 N.Y.S.2d 341, 345 [5].

## THE STATE'S BURDEN?

██ Appellant claims that the court erred in submitting the cause to the jury because the state failed to produce evidence (other than the book itself) of obscenity and the standards of the community and left it up to defendant to prove that the book is a work of literary art; that the state thus failed to introduce any evidence on the crucial issues; the state must adduce proof of community standards and the prurient effect of the book (by expert testimony) in order to give the jury some standard other than its own speculation on these matters, and that mere introduction of the book in evidence is insufficient to make a case for the jury. While this is the rule in the federal courts in the second circuit, United States v. Klaw, 2 Cir., 350 F.2d 155, it is not the rule in this jurisdiction. The rule here is that the question whether a publication conforms to general community standards and is obscene is not within the proper scope of expert testimony and that an opinion that a certain publication is obscene would invade the province of the jury by expressing an opinion on an essential ultimate fact to be determined by the jury. State v. Vollmar, supra, 389 S.W.2d, l. c. 29, 30 [25]; State v. Becker, supra.

The state made a submissible case. We turn now to the other points of error made by appellant.

## DENIAL OF A FAIR TRIAL?

Appellant asserts that he was deprived of a fair trial because of the manner in which the trial court conducted the trial "because he improperly intruded into the trial by cross-examining, interrupting and interfering with the witnesses for the defense, exhibited his bias and prejudice against the defense by his attitude and actions toward the defense and defense witnesses, and abused his discretion." We are convinced from a study of this transcript that this point is well taken; that in spite of his efforts to avoid error the judge, no doubt subconsciously but nevertheless effectively,

assumed the role of a partisan, confused the functions of prosecution and judgment, and violated the principles which govern the conduct of trial judges in criminal cases, as laid down in State v. James, Mo. Sup., 321 S.W.2d 698.

The judge's personal opinion of Candy was revealed early when in an exchange with counsel during the taking of testimony on the motion to suppress evidence he referred to "the sale of this book Candy and all these other obscene books." Counsel asked if he was deciding "right now that this book is obscene." The judge said he had not decided anything but went on to say that "There are a lot of books on the newsstands that I consider obscene. I think most of the literature today wouldn't get any sale unless it also was obscene." When in the voir dire examination the prosecuting attorney referred to Candy as a novel the judge interrupted, inquired whether the prosecutor considered it a novel, and expressed his opinion that Candy "does not reach to the dignity of a novel." He preferred that it be called "a paperback book."

The judge's predilection to interrupt counsel in the presentation of testimony and to dominate the proceedings is suggested by the fact that during the 87 pages of testimony on the three pre-trial motions the judge interrupted fifty some odd times with statements not necessary in the making of legitimate rulings or the conduct of the proceedings in an orderly manner.

During the presentation of the state's case the judge did not interrupt counsel or witnesses. Interruptions of defense counsel and witnesses during the presentation of the defense, however, were frequent and at times threatened to disrupt the proceedings. According to appellant's count, the trial judge injected himself into the proceedings on two of every three pages of the transcript of the proceedings before the jury, excluding purely formal interrogation such as qualification of witnesses. When a question called for an answer which was objectionable to the judge he

would interrupt and say, "I anticipate that the state wants to make an objection," or "Do I understand the state is not objecting?" The judge would raise his own objections to the propriety of answers sought to be elicited from defense witnesses without any objection by the state. He would call the attention of the prosecuting attorney to the fact that the state was changing its position or opening the door for the introduction of evidence by the defendant on certain subjects. The prosecuting attorney inquired about "the common man." The judge corrected him with "Not the common man. The average man." A defense witness, a Presbyterian minister, was asked "What is the nature of pornography?" The prosecuting attorney suggested that the witness should state definitely "what pornography is." The judge, not wishing this question answered, interrupted the proceedings and called for a conference outside the hearing of the jury in which, in effect, he raised and sustained his own objection, telling the attorneys he would not permit the witness to state what is or is not pornography, and would limit the inquiry to whether Candy is a work of literature. He interrupted counsel's inquiry concerning standards of living of the people with whom an expert witness had conversed (to lay a foundation for an expression of opinion as to the response of the people to the issues of our times) and inquired "What would standards of living have to do with this?" When the witness opined that there is "a wide acceptance of a variety of attitudes towards sex" he interrupted with "A wide acceptance of what?" and when the witness later talked about "tremendous latitude" the judge said "Latitude for what?" When the witness indicated that Candy does not appeal to most people but has a limited appeal the judge tried to convert this into an acknowledgment that Candy does not measure up to the national standards of morality. The witness resisted this invitation and added that Candy is a healthy addition to the standard of morality. Thereupon the judge pursued with "I understood you to say that

the majority of the people didn't approve of this book; isn't that what you said?" The witness started to answer, saying, "Most people don't have the kind of interest in—this book seems to me—." The judge interrupted with "What do you mean by most people? That is what I am trying to find out." The witness, now thoroughly badgered, answered that he did not think that most people look for novels dealing with sex mores of our country. The court then commented "Well, then, you are saying in effect that you don't know what the sex mores, the national sex mores, are then?" The state waived cross-examination, whereupon the judge took over, asked whether the minister was appearing as an individual or as a representative of the Presbyterian Church; whether he occupied an official position with the church; whether based on his training and education he would say that the morality of the nation is an important matter; whether he would further say that it is important that it be a good morality; whether "such a book as this strengthens and fortifies the morality of this nation." When the witness said that the book "undermines immorality" the court, apparently unsatisfied, persisted with "You wouldn't say, however, that it strengthens morality, would you?" When an apparently unsatisfactory answer to this question was given the court asked the minister if he had studied history. Assured that he had the court then asked: "Would you say that the downfall of many nations has been preceded by a falling, by a deterioration of their morality?"

A poet testified that he was familiar with books that have been called pornographic but which have been considered by the court to be works of art. This enlisted the interest of the judge who, openly stating that he "wanted to be sure that he was not saying that pornography was accepted literature," actively cross-examined the witness on this matter, finally driving him to a distinction between books of pornography which are actually works of art and hard-core pornography. When the poet ex-

pressed an opinion that Candy had social importance as a satire the judge interrupted and sought to discredit the witness by eliciting the fact that he was not a sociologist. When the witness sought to compare Candy with Candide the judge developed the fact that sex morality was not the main feature of Candide and that it had been 7 or 8 years since the witness read Candide.

A Catholic priest, testifying about national morality and literature, stated that sex matters could be spoofed without dealing with pornography or appealing to prurient interest. The court interrupted, saying "I would like to interject one question. Is it possible that a book that is a satire or a spoofing of a subject * * * could also be obscene and contain pornographic matter?" Notwithstanding the witness answered "Yes" the court insisted "Simply because it is a satire or a spoof does not mean that it could not be obscene or pornographic, is that right?" When the priest stated that a good satire with "good spoofing" could have social importance the court asked "Even though it was obscene and pornographic?" When an affirmative answer was given the judge, stating that he did not like to "interject" himself here, pursued the witness with five pages of intensive cross-examination on his statement that because of increased literacy the people are better able than in former years to judge whether a thing is well-written or not, and on the question whether the national standards of morality have slipped within the past 20 years. Thereafter the judge asked the priest whether the church had changed its views; whether the church had become more liberal on morality; whether the priest had any connection with the unofficial church organization called the Legion of Decency, and the function of that organization; whether the priest had a different standard for obscenity for one group over another group; whether it is the policy of the church that certain people are allowed to read obscene books because they are educated, and whether sophistication is an excuse for obscenity. He tried unsuccessfully to get the priest to say that for a person to be well educated he must have a course in obscenity, immorality and pornography. Defense counsel at one point objected to the conduct of the court "in taking over the cross-examination of witnesses, entering into the discussion in a highly partisan manner, expressing by facial expressions disbelief of the witness's statements; and making an assumption throughout the course of the Court's cross-examination of the witness that we are dealing with an obscene book." The court stated that counsel's observations as to the facial expression of the court was only counsel's opinion and that it was not true. He sought to justify his actions on the ground that the testimony was ambiguous and needed to be cleared up for the jury.

An Episcopal minister, who had not read Candy, testified that community standards in relation to sex morality are extremely lax and that "by and large anything goes." When the state's cross-examination ended the judge took over and brought out that the witness was not in court under subpoena; asked him whether he came to court voluntarily; whether he knew the purpose of having him come to court and whether that purpose was "to defend this book Candy?" After objection the court persisted, making sure to elicit that the minister knew when he came to court that "The trial is over the book Candy" and that he came voluntarily.

The judge interposed himself repeatedly and continuously throughout the testimony of defendant's psychiatrist. Without any objection by the state the judge interrupted when the witness was asked to give his opinion on national contemporary standards of morals in this country, and admonished the witness not to give what he personally thought the national standard is but "what he has found out to be the national standard." After pages and pages of frustrating haggling over terms, admonitions, limitations, objections and interruptions the witness finally gave his answer.

In an obvious attempt to soften and tone down the effect of the answer the judge asked "You mean it is an accepted standard, or that it is done and condoned?" When the witness was asked to give his opinion whether Candy violated the national standard the judge interrupted to ask whether the U. S. A. is a moral or an immoral community. When the witness finally was permitted to say that Candy was not unacceptable or out of conformity with the national standards the court, in apparent disbelief, said to the witness: "Are you saying that you found in going around the country that people approve of books such as Candy and that it is considered the reading standard of the U. S.?" The court got into an exercise in semantics with the witness over the word "exceed" when the latter said that Candy does not exceed the national standard. The court then directed the prosecutor to question the witness as to what groups of people he gained his knowledge from. The witness was finally pinned down to the statement that he had spoken with three or four dozen people. The judge then asked if his opinion was "based on just those forty people, or forty eight people?" When the witness answered "Yes" the judge said "Sir?" When the witness reaffirmed his answer the court said "Your answer is 'Yes'?" The witness said "yes" for the third time, whereupon the court, finally yielding, said "All right."

█ Time and space prohibit further delineation. On the whole record the trial judge, a man of unimpeachable honor and firm convictions, in an effort to see that justice was done according to his concept of justice in obscenity cases, exceeded his powers, failed to maintain "that fine balance of impartiality, neutrality and objectivity" required of trial judges,[9] and evidenced to the jury his personal view that Candy is obscene and detrimental to the morals of the United States.

Reversal and remand on one point ordinarily makes it unnecessary to consider other points of error. The other points raised on this appeal, however, are of such a nature that in the event of another trial the court will be confronted with many and possibly all of these same questions. For this reason we will settle these issues on this appeal.

## DISCRIMINATION AGAINST DEFENDANT?

Appellant claims that he was denied equal rights and equal protection of the law because he was arbitrarily "swooped down upon" and arrested while others equally guilty of selling this book and similar books throughout the St. Louis area were not arrested. "The fact that third persons have also violated the law without being prosecuted therefor is no excuse for a violation by accused; * * *." 22 C.J.S. Criminal Law § 53, p. 190. And see 21 Am.Jur.2d Criminal Law § 138. In United States v. Rickenbacker, 2 Cir., 309 F.2d 462, the following from United States v. Manno, N.D. Ill., 118 F.Supp. 511, was quoted with approval: "The fact that not all criminals are prosecuted is no valid defense to the one prosecuted." See also Strand Amusement Co. v. Commonwealth, 241 Ky. 48, 53, 43 S.W.2d 321, 323; Highland Sales Corp. v. Vance, 244 Ind. 20, 186 N.E.2d 682 [5]; Grell v. United States, 8 Cir., 112 F.2d 861. The Supreme Court of Ohio states it this way: "Uniform operation of criminal justice does not require the release of the guilty for failure to prosecute others equally guilty." Maloney v. Maxwell, 174 Ohio St. 84, 186 N.E.2d 728 [3]. A defendant can derive no rights from a failure on the part of the prosecuting officials to enforce a law. State v. Ward, 361 Mo. 1236, 239 S. W.2d 313, 321.

█ In the exercise of his discretion a prosecuting attorney has the right to choose a course of action or nonaction, as long as he does not act wilfully or in bad

9. Harms v. Simkin, Mo.App., 322 S.W.2d 930, 939.

faith. "That discretion may, in good faith (but not arbitrarily), be exercised with respect to when, how and against whom to initiate criminal proceedings." State on Inf. McKittnick v. Wallach, 353 Mo. 312, 182 S.W.2d 313, 319, 155 A.L.R. 1. Here the city counsellor notified the vice division of the police department that in his opinion the book Candy was obscene and that the department had the right to make arrests for its sale. The officer in charge of the vice division instructed his officers to canvass various bookstores throughout the city to see if they could purchase the book. The officers made inspections in several other downtown stores, found none, but made one other arrest in another district. On this record we cannot say that the prosecuting attorney acted in bad faith, or exercised his discretion arbitrarily or corruptly, or that the statute regulating obscenity has been "applied and administered by public authority with an evil eye and an unequal hand." Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220; United States v. Rickenbacker, supra.

## AN UNQUALIFIED JURY?

██ Appellant claims that the jury empanelled in this case was neither qualified nor capable of deciding whether Candy is obscene; that their educational background, reading habits, breadth of vision through travel, experience, etc. as revealed by extensive voir dire examination demonstrates that they were not capable of determining whether Candy conforms to general community standards or is obscene; that a more informed jury with greater awareness of literary matters is required in an obscenity case. There is no showing that the jury was not· selected according to law or that any individual juror was so inferior and limited as to be ineligible to sit in judgment on this case. The General Assembly has prescribed the qualifications of and a procedure for empanelling juries in all cases and has not seen fit to make any other or different provision for the empanelling of

a jury composed of persons with better-than-average educations or higher-than-average cultural refinement in "unusual" cases. This jury was carefully selected under this system. We are of the opinion that the jury actually empanelled was a jury of "average citizens" in whose ability to decide this very type of case this Court expressed its confidence in State v. Vollmar, supra.

## VOIR DIRE EXAMINATION TOO LIMITED?

In the voir dire examination appellant's counsel attempted but the court refused to permit him to question the jury as to their belief in the presumption of innocence, burden of proof, reasonable ·doubt, and the average person test in the determination of obscenity. Now it is urged that the court abused its discretion in refusing to permit defense counsel to examine into the qualifications, beliefs, attitudes and inclinations of the jurors and their ability and willingness to follow the court's instructions, in connection with these subjects. The assignment of error is broader than the position taken at the trial.

██ This complaint refers to two incidents. In the first, defense counsel stated to the veniremen: "The defendant has entered a plea of not guilty, and he stands presumed in the eyes of the law to be not guilty." An objection was sustained on the ground that this was a comment on the law. The judge stated that he would instruct on the law. Counsel indicated that he wished to question the members of the panel "as to whether any of them have any personal feelings for or against the rules which create a presumption of innocence on the part of the defendant; the rule which requires the State to sustain the burden of proof throughout the case; and rules pertaining to reasonable doubt." The request was denied. The ruling was proper. Asking whether prospective jurors have any personal feelings for or against a rule of law is like asking whether they think the

law is good or bad. When the latter question was before this Court in State v. Mosier, Mo.Sup., 102 S.W.2d 620, we said, 1. c. 624: "Their opinions on the merits of the law were immaterial unless so unyielding as to preclude them from following the law under the court's instructions. That should have been the question asked [citing State v. Pinkston, 336 Mo. 614, 79 S.W.2d 1046]." In the instant case the personal feelings of the veniremen for or against the rules referred to were immaterial unless with respect to those rules they entertained views so unyielding as to preclude them from following the law under the court's instructions. Defense counsel did not indicate any intention to question in this area. As to the second incident: After defense counsel had told the veniremen that the real question was whether defendant possessed the book with intent to sell and whether this book is in fact obscene, and after questioning them with respect to vivid or lurid descriptions to be found in the book, he said: "The determination of this question of obscenity is one for you to make judged by what the average person * * *." He was interrupted at that point by an objection on the ground that this was a matter of law. The objection was sustained with this comment, "The court will instruct the jury on the law." Defense counsel explained that it was absolutely necessary to inquire "whether they can apply the standards of an average person rather than of their own actual circumstances themselves * * * concerning their belief as to the average person test." The court stood on its ruling. There was no error in the ruling. The record indicates that defense counsel was not asking a question but was informing the jury as to the law. This is not the prerogative of counsel. State v. Bolle, Mo.Sup., 201 S.W.2d 158 [3]. "The correct procedure is for counsel to ask the members of the panel whether, if the court later instructs them in a specified manner, they have any opinion or conscientious scruples such as would prevent them from returning a verdict accordingly—* * *." State v. Mosier, supra, 102 S.W.2d, 1. c. 624.

We find no abuse of discretion in the conduct of the voir dire examination. Unusual latitude was accorded counsel. The report of the examination occupies pages 102 to 262 of the transcript—160 pages of voir dire examination, which is more than the entire record in many cases.

## CANDY INADMISSIBLE IN EVIDENCE?

Error is assigned in admitting into evidence 9 copies of Candy seized by police officers, for a variety of reasons. The principal contentions under this point (that the search was unreasonable and illegal because the officers had no search warrant, and that there was no prior judicial determination that the book was obscene as a matter of law) were answered in detail in State v. Vollmar, supra, and we will not burden this already long opinion with a reiteration of what we recently said on these subjects in that case at 389 S.W.2d, 1. c. 24–26.

 It was not error to receive the book in evidence on the ground that it was evidence of another crime (sale rather than possession with intent to sell). The sale of the book is competent evidence of possession with intent to sell.

 There was sufficient evidence of possession with intent to sell. Neither ownership nor actual physical possession is necessary to constitute "possession" within the meaning of the statute. See State v. Jenkins, 321 Mo. 1237, 14 S.W.2d 624, and cases cited. Defendant was shown to have had custody and control of several copies of Candy and to have held them at his disposal for sale to the public. See State v. Virdure, Mo.Sup., 371 S.W.2d 196, 199. The jury could find that defendant was in possession of the several copies of Candy with intent to sell them from the evidence that he worked, clerked and sold books to customers at the bookshop where Candy was purchased; that he discussed books

with customers who came into the store; that he knew that the copies of Candy were in the store and for sale, and knew where they were located; that he did orders, paid bills, and worked long hours (an average of 10 hours a day) at the store; that he had access to the cash register; that he received books in payment for his services, and that he actually sold the book Candy.

█ Finally under this point appellant claims that the recent enactment of § 563.285, V.A.M.S. (Laws 1965, p. 670) preempted the field with reference to prior restraint of published matter and required a judicial determination of obscenity before any of the seized books could be introduced in evidence. The object and purpose of § 563.285 is different from that of § 563.280, under which defendant has been convicted. The object and purpose of § 563.285 is to prevent the sale and distribution of obscene material by injunction, seizure and destruction. It provides for a quick trial and quick decision of the issues in the case in order to afford constitutional safeguards for the protection of those selling or distributing nonobscene publications—to avoid the situation in which nonobscene matter might be seized and held for considerable periods of time. The object and purpose of § 563.280 is to criminally punish persons who shall sell, distribute, etc. obscene matter. Defendants prosecuted for violating this criminal statute are afforded the usual constitutional protections. Section 563.285 does not refer to § 563.280 and in prosecutions under § 563.280 does not require a prior judicial determination of obscenity before books found on the premises following a lawful arrest for possessing obscene matter with intent to sell can be taken into possession as evidence in the case, either in terms or by necessary implication. Section 563.285 does not preempt the field as claimed. The two sections are separate and distinct and are to be enforced independently.

## DENIAL OF RIGHT TO A PUBLIC TRIAL?

█ Appellant objected to the action of the court in giving nine copies of Candy to the jury to read silently in the jury room in the presence of a deputy sheriff, during which time the court transacted other business unrelated to this trial. The objection is that this deprived appellant of his right to a speedy and public trial and to be present at such proceedings and to have the judge present during all stages of the proceedings. Appellant argues that the court's suggestion that the state and the defendant could go into the room or that spectators could gather there to watch the jury read the book did not cure the error; that the room was too small to accomodate visitors and defendant's presence alone in the room would have had a harmful and adverse effect upon appellant.

Having carefully considered the record in this connection we find no violation, but rather a careful safeguarding, of defendant's constitutional rights in the manner in which the problem of acquainting the jury with the contents of the book was solved. See United States v. West Coast News Co., D.C., 228 F.Supp. 171, aff. 357 F.2d 855; Winters v. United States, 8 Cir., 201 F. 845.

## REFUSAL OF EXPERT TESTIMONY?

█ The trial judge permitted extensive testimony by experts as to the literary qualities of Candy, whether its dominant appeal was to prurient interest in sex, and whether it offends contemporary community standards. Appellant complains, however, of the consistent refusal of the judge to admit the opinions of the experts on the ultimate fact issue, whether the book is obscene. This subject is foreclosed by State v. Vollmar and State v. Becker, supra.

## IMPROPER INSTRUCTIONS?

Appellant claims that the main verdict-directing instruction and the instruction defining terms erroneously stated the law

and did not instruct the jury on all elements of the case. We consider the instructions as a proper declaration of the law under the test laid down by the last controlling decision of the United States in which a majority of the justices agreed on the test to be applied, namely, United States v. Roth, supra.

## IMPROPER REFUSAL OF INSTRUCTIONS?

Appellant offered Instructions A through G. All were refused. Appellant complains that the court erred in refusing them because they were proper statements of the law, not covered by the instructions given. A included the tests laid down by three of the justices in Memoirs v. Com. of Massachusetts, supra. That opinion is not binding upon this Court because a majority did not concur in the suggested tests. Where a majority of a multi-judge court arrive at the same general result but for different reasons—where it does not appear that a majority of the court agreed as to the reasoning or as to a particular ground of the decision—the case cannot be considered as authority on the point concurred in by some but less than a majority. State ex rel. Columbia Nat. Bank of K. C. v. Davis, 314 Mo. 373, 284 S.W. 464; 21 C.J.S. Courts § 189; 20 Am.Jur.2d Courts § 195, p. 531, fn. 1. B erroneously required a finding that defendant knew that the book was obscene. C erroneously authorized an acquittal by comparing it to "Tropic of Cancer," a book which was not admitted in evidence. D instructed on an element contained in the given instructions. E erroneously directed the jury to consider the effect of the book on the average *adult person,* and not its effect upon teenagers or children, whereas the true test is its effect upon the average *person.* The gist of F was included in the given instructions. G dealt with mitigating facts. Its refusal did not constitute reversible error.

For the reason given the judgment is reversed and the cause remanded for further proceedings.

All concur except SEILER, J., who dissents in separate dissenting opinion filed.

## DISSENTING OPINION

The majority opinion rules the question of obscenity on the basis of whether there was evidence from which a jury could say the book was obscene, although declaring it is our duty, as it is, to make an independent judgment on the mixed question of law and fact on the constitutional issue. Under the recent decisions of the United States Supreme Court it seems quite clear to me the book cannot constitutionally be held obscene under the facts of this case. These decisions are binding on us. I therefore respectfully dissent and adopt as my dissenting opinion most of the opinion prepared by Judge Higgins, Commissioner in Division One, which reads as follows:

On March 31, 1965, Detectives Edwin Kuster and Ezell Nance of the St. Louis Police Department went to the W. A. Burgdorf Book Seller Shop at 4744 McPherson, St. Louis, Missouri. According to Detective Kuster, "Detective Nance waited outside, and I went in and conducted myself as a customer. * * * I asked Mr. Smith if he had the book CANDY to sell, and he said he did. And I told him I wanted to buy a copy, and * * * He went back to this service counter at the rear of the store, and he produced a copy of the book CANDY. * * * He gave me the book, and I gave him the seventy-five cents, and I asked him if he were familiar with the book, and he said that he had read it and found it very amusing. * * * I went on and got my partner, Detective Nance, and then we both went back in the store and placed Mr. Smith under arrest. * * * We asked him if he had any more copies of the book." Mr. Smith pointed them out and eight additional copies were confiscated. The purchased book, a paperback copy of CANDY, Bran-

don 75¢, bearing the name of Maxwell Kenton (apparently a *nom de plume* of the authors, Terry Southern and Mason Hoffenberg), became Exhibit 1; the eight identical confiscated books became Exhibit 2.

In addition to Exhibit A, defendant's case consisted of his own testimony, other exhibits, and the testimony of a number of expert witnesses, none of whose qualifications were questioned. Their testimony offers sufficient detail on literary style, plot, purpose, content, and value of CANDY to render unnecessary further review of the book; however, a brief synopsis available from the introductory portions of [the paperback] edition is an aid to understanding the evidence and the book itself.

The cover and synopsis page of the paperback edition say of the book:

"THE MOST WHISPERED ABOUT BOOK OF THE CENTURY!

"A modern day *Alice in Wonderland,* more scandalous than *Lolita,* is CANDY.

"This is the delightfully shocking tale of. an innocent, pure, young girl living and loving in today's crazy, mixed-up world, and trying to make sense out of the nonsense that she finds.

"A biting, satirical comment on the frustrations of Society, CANDY is the book the whole world is talking about * * * the book about which the critics have been raving—and the censors roaring!

"IF YOU WANT TO BE SHOCKED, TICKLED, ENTERTAINED, HERE IS THE PERFECT ANSWER FOR YOU * * * IN THE FORM OF THE WITTIEST, BAWDIEST BOOK OF THIS ERA!

"Was she VERY good—or very, very BAD?"

The paperback has this introduction:

"The publication of *Candy* in this country became inevitable following the favorable court rulings for *Lady Chatterley's Lover* by Lawrence, *Tropic of Cancer* by Miller, *Fanny Hill* by Cleland and a host of other works dealing frankly with sex.

"*Candy* is an hilariously funny spoof on sex and is tepid when compared with (other) probing and disturbing works * * *.

"Until recently, sex has been treated with such deadly seriousness that this spoof on sex is refreshing in the extreme. *Candy* is good clean fun."

The tone of the paperback edition of Candy's adventures is set by an epigram in French from the works of Voltaire which may be translated: "Candide, chased from earthly paradise, walked a long time without knowing where—Candide, quite stupified, couldn't really see anymore how he was a hero."

Rollin Eugene Smith admitted the sale of a paperback edition of CANDY to Detective Kuster and that he had previously read the hardback Putnam edition of CANDY. Exhibits B–1, C–1, E–1, E–2, and F–1 in evidence as items from the book page of the Sunday editions of the St. Louis Post-Dispatch for August 9, 1964, August 16, 1964, September 13, 1964, September 20, 1964, and October 18, 1964, showed CANDY on the list of national best sellers for 8, 8, 13, 14, and 18 weeks; B–1 and C–1 also showed CANDY in the $5.00 Putnam edition as "the novel that's fast becoming as famous as LOLITA"; F–1 proclaimed that "112,000 Americans love CANDY, National Best Seller, The Comic Masterpiece by Terry Southern and Mason Hoffenberg"; and D–1 and E–2 described CANDY as "#1 best seller in TIME magazine, A novel by Terry Southern and Mason Hoffenberg, 120,000 copies in print." In connection with his testimony, it was stipulated that CANDY appeared on the national best-seller list in the Sunday Post-Dispatch for thirty-four weeks between June 21, 1964, and January 31, 1965. Exhibits G through BB were best-seller lists from TIME magazine, showing CANDY's position June 5,

1964 (10); June 19 (6); June 26 (5); July 3 (4); July 17 (15); August 7 (3); August 14 (5); August 21 (4); September 4 (2); September 11 (1); September 18 (1); October 9 (1); October 23 (1); October 30 (1); November 6 (2); November 13 (3); November 20 (2); November 27 (3); December 4 (3); December 11 (3); December 25 (4); February 12, 1965 (8). Mr. Smith was familiar with these matters prior to his arrest for the sale of CANDY. He had no reason to doubt their accuracy and, after having read CANDY, he formed an opinion that it was not obscene. While traveling outside the St. Louis area he had observed TROPIC OF CANCER, LADY CHATTERLEY'S LOVER, and FANNY HILL on other bookstore shelves. He had discussed the book with students, teachers, and professional people who constituted the clientele of the store.

Miss Louise French was the assistant buyer in the bookshop for Scruggs-Vandervoort-Barney, Inc., owner of three department stores in the St. Louis area. Prior to the arrest of Mr. Smith her bookshops had purchased CANDY at wholesale and had sold eighteen hardback, and an estimated fifteen paperback, editions. Mrs. Thomas Sherman of the St. Louis Post-Dispatch called her once a week "to get our best-selling ten titles * * *." She was aware of CANDY's position on various best-seller lists.

Robert Faith was district manager for three Doubleday Book Shops in the St. Louis area. Prior to March 31, 1965, his stores made retail sales of between two hundred and two hundred fifty hardback, and approximately five hundred paperback, volumes of CANDY without arrest. Their wholesale orders of CANDY were received by mail. He, too, was aware that CANDY was listed on various best-seller lists.

William G. Dixon was assistant buyer in the book department of Famous-Barr. Prior to Mr. Smith's arrest Famous-Barr sold approximately three hundred hardback editions of CANDY through its five bookstores in the St. Louis area without arrest. He was unable to say how many paperback copies Famous-Barr sold during the same time.

Peter L. Simpson held B.A. and M.A. degrees in English from St. Louis University; was assistant professor of English at Lindenwood College for two years; had taught in the evening college at Washington University and as a graduate fellow at St. Louis University; had instructed and lectured in English at Southern Illinois University; had published articles of literary criticism and poetry both locally and nationally; had traveled extensively and had become acquainted with the reading habits of people in all parts of the country. He was familiar with the form of literary expression known as satire and explained satire as "a way of presenting manners or morals in a given culture that may be absurd * * * or to the detriment, usually of society. Satire is concerned more with correcting * * * the manners and the morals of society * * * and usually this is done by presenting human actions in ridiculous or absurd circumstances so that the inequities or absurdities are made quite clear." In his opinion CANDY was "a work of art" and told a story in an accepted and literary sense. "It is a form of narrative satire in related episodes. It is carried along in terms of the experiences of a single character around whom all the events revolve." He thought that CANDY had a plot and, as to the type of literature, "it is a form of satire." Offered opinions on obscenity *vel non* from this witness were refused but cross-examination elicited additional observations: As to whether CANDY is a work of art, Mr. Simpson answered, "Yes. * * * It uses the power of imagination to construct a work of literature that tries to give us in terms of its own methods a vision into the way that life is being lived today.

"Q. * * * would you say that this is an accurate portrayal of life as it is known today? * * * A. * * * It is satire. * * * An accurate portrayal of life, no. * * * It is, as I said, devices of humor

and ridicule which often partake also of the absurd, and when you talk about life as it is lived today, I guess you are trying to make some kind of judgment as to what normal life is. * * *

"Q. Would you say this is a good or a bad satire? A. I would say it is moderately good satire.

"Q. * * * Will you tell this Court and jury what your opinion is of this plot? A. Well, * * * I understand a plot as a principle of organization around which the whole work revolves, and it is a series of episodes dealing with the experiences of a very shallow and stupid young girl * * * getting into various situations that could take place in our society. If a shallow, stupid young girl could go to college, she could go to a hospital; she could go, I suppose, even to a motel, she could go home. It takes her through various places where I guess shallow, stupid girls could be expected to go, and shows in excessive ways what the commercialization and what the cheapening of the meaning of sex in contemporary life has done to keep her from any honest, decent touch with other human beings or with life as it ought to be lived. * * * I think I was asked the question in my course in the evening college at Washington U as to whether there would be any harm in reading it, and I said no, I thought it was a funny book * * * if they wanted to read it, they might get some enjoyment out of it." Mr. Simpson also stated that the portrayal of Candy Christian as a shallow, stupid young girl did not mean the book should not be available for public consumption.

Norman D. Hinton held B.A. and M.A. degrees from the University of Tulsa and a Ph.D. degree from the University of Wisconsin, all in English Literature; was Associate Professor of English at St. Louis University, and had taught previously at Princeton University and as a graduate assistant at the University of Wisconsin; was a member of The Modern Language Association, the Medieval Academy, the American Name Society, and the State Linguistics Society; had published over twenty articles on English Literature in journals and in the new Catholic Encyclopedia; had a pamphlet "coming out" on Aldous Huxley's novel, POINT COUNTER POINT; had an article in the Journal of the American Name Society on Chaucer's REEVE'S TALE, one of the Canterbury Tales; and was preparing an article for the Western Michigan Medieval Conference on the ninth of the Canterbury Tales. Dr. Hinton considered TROPIC OF CANCER and CANDY to be works cf literary art. With reference to the description of matters pertaining to sex in CANDY and CANCER, he evaluated TROPIC OF CANCER as treating such matters "largely for shock value; I don't believe that is true of CANDY." Dr. Hinton compared CANDY as similar in style to previous works of author Southern in that they all attack some aspect of American life. "* * * I have expressed myself on (CANDY) * * * in the St. Louis Review. I take CANDY to be again a satiric attack on certain peculiar aspects of American notions towards sex. For instance, that the woman always is not really involved in the act, but simply feels sorry for the man, or is fulfilling some need of his as his superior, or in other words, detached from it and not really a partner in any kind of act of love, but merely takes pity on this poor creature. Also the notion, the whole notion, I think, of over-romantic love. What it of course comes down to, and what is not expressed frequently, is some kind of normal human desire, but the rhetoric in which it is couched is of course those of excessive sentimentality, or pretending to be engaged in another occupation altogether from time to time, * * * (CANDY) is written the same way that all of his other books have been written, episodic and with a good deal of playing with words and generally witty approach to the subject matter throughout." He was familiar with reviews of CANDY by Nelson Algren in LIFE Magazine, Stanley Kauffman in the New Republic, and William

Styron in the New York Review of Books, and was aware of others.

Dr. Hinton's opinion of CANDY's social importance was that "it dealt with a particular ill of the American social scene. * * it was a very important one. I would feel that attitudes towards sexual relationship which are distorted for purposes of sentimentalization or commercialization are very dangerous things, and I believe that is what the book deals with. * * * I believe the author presents for ridicule this distorted view of sex. * * * I think it makes fun of various literary styles as well as its thematic material, and I think it makes fun of certain fashions in contemporary literature as well." In his opinion the book does not go beyond customary limits of candor as reflected in books currently on the market. In comparison to TROPIC OF CANCER, "It is less candid; * * * It does not go further (than LADY CHATTERLEY'S LOVER) * * * it does not go as far as FANNY HILL." CANDY "is typical of writers who deal with what we call satire; irony; burlesque; parody; and associated forms. To deal bluntly, or with a good deal of candor about such matters. I would refer to Rabelais, to Swift; Shakespeare; to Chaucer; to Boccaccio; numerous other writers whose works are traditionally taught in university courses and who are reprinted widely. * * * there are a number of what one might call ribald puns in Shakespeare, which deal with words that are not commonly spoken today, at least in polite society; * * * I would say that Chaucer deals in terms that are sometimes at least as frank as CANDY. The Miller's Tale is the most famous example, I believe * * *." Finally, Dr. Hinton's opinion was that the predominant appeal of CANDY is not to the prurient interest.

Cross-examination of Dr. Hinton elicited his opinion that CANDY "deals with thematic material which is of some importance * * * in contemporary society. I believe it makes an effective presentation of this ridicule, of this material. * * * there is a good deal of wit and verbal style in the presentation * * *. It deals with material which plays a prominent role in the life of the average citizen. * * * It portrays what is thought to be love, but it is not. * * * it shows by spoofing, by ridicule, false views, false notions of love that one sees displayed in contemporary writing. * * *

"Q. Do you believe that this book has any shock value or not? A. I believe that in order for a book to be a satire or parody or burlesque, that it has to deal in exaggeration and restatement of material as part of the equipment of the satirist so as to force you by your shock at seeing familiar materials in a different setting to re-examine the rules you generally apply to those things. In TROPIC OF CANCER I don't find that present. I find shock for the sake of shock.

"Q. You don't believe this book has any shock for the sake of shock in it? A. Not solely for that purpose, no."

In respect to particular episodes and expressions of "need" of Candy (the girl), Dr. Hinton said, "It appears that Southern extends this desire over into the physical universe; the bar stool, the statue of Buddha, and various other objects, I believe." In respect to the barstool and the bohemian hunchback, Dr. Hinton believed: "that is a —one of the points which I find the material exaggerated beyond the normal situation, and that that is advisedly not to be taken as a description of reality. This is one of the sort of movements of CANDY in what literary critics call the mythic dimension. She sort of becomes the things which the entire universe needs. I believe this is done by Southern deliberately to over-state and show how silly the whole attitude is; that this is, of course, impossible. * * * It serves the purpose of satiric exaggeration. * * * It is precisely in places like this that you realize that this is in no way a realistic portrayal of sex. * * * If I say it distorts certain values, a satire on American society, then I have said what I think is good about the book."

Upon further cross-examination, the witness was asked to read a single isolated passage, selected for its candor, and to tell what literary value its words had "in connection with the whole book as you know it." Dr. Hinton answered: "One can only relate them again to the dominant theme in the book. Aunt, I believe her name is Livia, represents in one moment the suburban woman acting naughty in a night club. Another moment, when she thinks that Candy has spent the night with her husband Jack, that is, with Livia's husband Jack, she acts like any enraged wife despite all her juvenile attempts to act sophisticated on sexual matters. I think that this is so obviously, statements like this are so obviously overdone and so clearly presented in a way that even Candy objects—she blushed later in the same passage—they represent a kind of secondary theme in the book. The uncle, —I mean Aunt Livia and Uncle Jack appear to be quite solid members of the community, and the sort of places they go, and the people they talk to, and yet they enjoy this kind of verbal playing with terms considered—even that they say they consider naughty. And yet when it comes right down to something happening later on in the book, Aunt Livia displays a good deal of shock and outrage, and threatens Candy angrily; and then later herself participates in an act with the doctor. I think Aunt Livia is a fairly important secondary character. In fact she is far worse than Candy, because she simply does this in a spirit of fun without any, evidently having any meaning behind her utterances. It seems obvious also that when it comes right down to an extramarital matter concerning her husband, her reactions are quite normal; and when it concerns herself, she writes Candy a letter boasting about it. She seems to me to be a thoroughly hypocritical person, and therefore in line with the dominant theme of the book.

"Q. Would you say that is offered for shock value? * * * A. * * * Well, * * * in the whole context of the book, I think it has other purposes than shock value, which I have just been talking about.

Right there by itself, I assume that it does have shock value." The court thereafter refused any further cross-examination on isolated passages taken out of the book's context.

Dr. Hinton had recommended the book to "friends and colleagues" thinking "they would find it an amusing book."

Anthony Morley was a priest and coordinator of Episcopal Church planning for the St. Louis metropolitan area. He studied at Haverford College in Philadelphia and as a Fulbright Scholar at the University of Vienna for one year; held a Bachelor's degree in Theology at the Episcopal Theological School in Cambridge, Massachusetts; engaged in graduate work at General Theological Seminary in New York City for three years; was an avid newspaper and book reader, television viewer, and extensive traveler. His work took him to various parts of the country where he came in contact with lay people of his church. In Father Morley's opinion, "contemporary national community standard in regard to sex morality is extremely lax or permissive. That is to say, that in our daily life and the things that we are exposed to, and raise no objection to being exposed to every day, there is a great deal of open, undisguised and powerful appeal to sexual consciousness, and since there is no great outcry against this in the community, I would say it was obvious that the country permits in its general social contacts a very high degree of what you might call sexual exposure. And you can take that in any sense you want; that is, verbally, or photographically, or sketched pictures, acting on television, advertising; just photographs and word articles in newspapers and magazines. * * * there is a very wide degree, a very high degree of the acceptance of the outright appeal to sexual feelings, and outright stimulation of sexual feelings, and this is part of the accepted community standard of the United States at this time. Whether this is desirable is another question. Now, in more highly literary works, and I take it

from previous discussion that CANDY would be considered one of these, * * * it seems to me that by and large anything goes, and there is not extensive objection to what is written or portrayed or alluded to in literature until somebody does it in a satirical or fun-poking way. * * * I think we all allow anybody who is making fun of anything to take certain liberties of exaggeration. An obvious exaggeration is the political cartoons in the newspaper." As to limitation of such exaggeration when the subject is sex, "There is no rational limitation in my mind."

Carl Dudley was the pastor of Berea Presbyterian Church. He had gone to Cornell University and had graduated from Union Theological Seminary; had studied at New York School of Social Work, Museum of Modern Art, in labor management school at the University of West Virginia, and at McCormick Theological Seminary on the church and the industrial society. Based on his travels, profession and work, Reverend Dudley "would say there is a wide acceptance of a variety of attitudes towards sex as well as toward many other things. Particularly so in literature, where a particular position is taken by an author and argued for one reason or another in a free society to establish his point of view. * * there is a tremendous latitude * * * For particular expressions, or for expressions of particular views * * *.

"Q. Would you say * * * that the book begins to impinge on the attitude of some other person, or on the health of society? A. I would say it enters into this insofar as it is a healthy antidote to other kinds of literature which are available. * * *

"Q. * * * Would you say that this book CANDY is within the scope of the wide acceptance of the great variety of attitudes towards sex in the modern American community? A. I would say yes * * Only that I don't think this book appeals to most people. I think its appeal is relatively limited to those people who are apt

to look for novels on the subject that this portends to deal with.

"Q. THE COURT: Are you saying that this doesn't measure up, then, to the national standards of morality? A. I think it is * * * I think it is a very healthy addition to the standard of morality."

As to social significance, Reverend Dudley thought that CANDY "delightfully buffoons what many people are taking very seriously and trying to get their kicks out of it. * * * I think the social significance is that it takes—it lampoons, it really makes into slapstick what many people are reading to find—what many people take so very seriously, namely, vicarious sexual experience, and as such I think it is an important book. * * * I think it is a good book." Reverend Dudley felt the author's intention was to spoof immorality, and in comparison to religious areas in which immorality has been spoofed, he testified: "Probably comparing similar things, I have always enjoyed reading the Gospels with the sense of Jesus taking off and lampooning the social pride and—of the people of his time by really laughing at them. * * *

"THE COURT: Would you say that such a book as this strengthens and fortifies the morality of this nation? A. If I may say, sir, I would say that book undermines immorality.

"THE COURT: You wouldn't say, however, that it strengthens morality, would you? A. Insofar as cutting the ground out of the opposition is concerned, yes."

Donald Finkel was poet in residence, teaching at Washington University, was an active writer of poems and had written three books; held a Bachelor's degree in Philosophy and a Master's in English from Columbia University; had done postgraduate teaching at the Universities of Illinois and Iowa; had instructed in English at Barnes College and Washington University. Mr. Finkel had read CANDY as well as other works by Terry Southern, i. e., the

movie script, Dr. STRANGELOVE, MAGIC CHRISTIAN, and his short stories, and had found similarity in the style of each work. "The method usually is satirical; that is, he blows up what he considers to be human weaknesses, usually contemporary human weaknesses, until they appear ridiculous. He also used * * * what we call the episodic narrative. This only means that he orders his story by little episodes in which the hero or heroine passes through a whole series of little adventures. Each chapter is a new adventure, usually." He would classify CANDY as satire, "one of the oldest forms" of literary expression. He would not call CANDY hard-core pornography. CANDIDE by Voltaire is a work of recognized literary merit. Comparing CANDIDE and CANDY, "I think that there are some very intentional similarities, both in the choice of name and * * * that the writer of CANDY chose an epigraph * * * from Voltaire's CANDIDE, as if to say * * * you should look for further parallels. * * * It strikes me that what Southern was doing was taking off on a variation of CANDIDE, but then he became freer as he went along. CANDIDE is a very naive young man. Candy is a very naive young lady. Candide believes that everyone is really good; that this is the best of all possible worlds. He has been taught this by a very wise professor, Professor Pangloss. There is a wise, or seemingly wise, professor in this book at the very opening, Professor Mephesto. Both of them are conceived of as wrong by the writer. At least one gets the sense that both the doctors who teach these young people are teaching them wrongly, are really phonies." Both characters are taken through a series of episodes in which they should learn that people are not as they thought they were, but "both of them very foolishly persist to the end of the book."

As to social importance of CANDY, "I think it is the usual kind of social importance that any satire has, if it works, and I think this intends to work. It is holding up to ridicule certain attitudes that people have, namely, in the case of this book, sexual attitudes highly romantic and sentimental and foolish sexual attitudes, which are reinforced by television, the movies, magazines, popular magazines. It also holds up those sexual attitudes, contemporary ones, for mockery. I think that this is very healthy. I think that is the whole point of satire, is to be a kind of check on human foolishness and when humans get too foolish, they ought to become aware of the foolishness. That is what satire tries to do and what this book tries to do, is to mock this foolishness so that we recognize it. It has to display it, has to exaggerate it to do this. * * * I felt in reading (CANDY) that he is also mocking at the soft headed liberal who feels that all he has got to do is love, and in this case it is all she has to do is love people in unfortunate positions; the Mexican gardener, the humpback, to achieve some sort of beautiful relationship without understanding for a moment the position and the problems and the needs of the Mexican gardener and the humpback. And of course she fails miserably to achieve any kind of understanding with them or of them, and she certainly doesn't help them out in any way. And I think that this is pretty much the same kind of thing that one conceives of the soft headed liberal doing."

David T. Thomas, Assistant Chancellor of the Archdiocese of St. Louis, was also assistant pastor at the Cathedral, did parish work, and was secretary on the Commission on Liturgy, Music and Art in the Catholic Church. He was ordained at Kenrick Seminary in St. Louis; had a doctorate in church law from Gregorian University in Rome; was serving in the office of censor of books for the church. He read "all kinds" of books, wrote book reviews for the St. Louis REVIEW, and traveled extensively. His opinion as to national contemporary community standards pertaining to morality and to sexual representations in literature was that "little by little the level or the development of appreciation of literature is

or has been growing in our country. Perhaps the word 'sophistication' is the word people don't like, but there is a true sophistication. One mark of this sophistication is the appreciation of literature. * * * the whole level has risen. Adults can be more like adults because of their education, and there is no damage that I can see among people who take reading seriously of, well, for instance the more honest, not hide it because it is sort of a dirty attitude concerning sexual morality. More people can talk about it now without blushing or giggling or behaving like an adult did in the past. The subject can be handled with reverence and honesty and is taken seriously, more out in the open, * * *." All literature and writing treats of sex "because it is part of the human nature. * * * But it is much more open; much more frank; much more true today than it was ten, twenty years ago." In his opinion, this is not in conflict with Christian morality.

As to whether satire or parody on matters pertaining to sex have anything to do with prurience, Father Thomas said, "sexual matters can be mentioned. They can even be spoofed in literature without any question of impurity or absolutely have nothing to do with pornography or prurience. * * You can describe it as hyperbole; purposeful exaggeration to get a point across." A book which is obscene and contains pornographic matter could, in the opinion of Father Thomas, be good satire or a good spoof, and such a book, if good satire and good spoofing, would "very definitely" have social importance. In respect to effects of allegedly obscene books on average persons, Father Thomas answered the court: "I could not see any great danger to Christian morality in giving people freedom to read what they choose." He amplified his statement on cross-examination. "If you mean by obscene something that is filthy in its writing, and calculated to bring forth prurient thoughts, perhaps actions, if that is what you mean by obscene, I wouldn't recommend this to anybody, nor do I read

anything except professionally of that nature. * * * But if you mean by obscene parts.dealing with the human body, for instance, having to do with sexual relations, if that is what you mean by obscene, then I would have to have a discussion with you because obscenity in that sense is not true. * * *

"Q. You wouldn't take an abnormal sex scene and use it to describe or teach morality, would you? A. I could."

John W. Higgins was a physician, psychiatrist, and practicing psychoanalyst. His undergraduate work and doctorate in medicine were accomplished at Cornell University; his internship in internal medicine at Yale University Teaching Hospital; his psychiatric training at Cincinnati General Hospital; his psychoanalytic training at Western Institute for Psychoanalysts in New Haven, Connecticut. He had practiced psychiatry since 1951 and was currently associate professor of Clinical Psychiatry at St. Louis University, was a fellow of the American Psychiatric Association, a Diplomate of the Board of the American Board of Neurology and Psychiatry, a member of the American Psychoanalytic Association, a member of the Group for the Advancement of Psychiatry; had written approximately twenty publications in his field, and had traveled fairly extensively in the United States. In Dr. Higgins's opinon on national contemporary community standards of morality, nudity, discussion of sexual matters in a vivid sense, and vivid descriptions of lovemaking were accepted as a part of the national standard. In his opinion, CANDY did not violate the accepted national standard. He found no relation between CANDY and books covering sexual perversion and sexual crimes or abnormal sexuality.

Lee Rainwater was a professor of Sociology and Anthropology at Washington University. He held a Master's degree in Sociology and a Ph.D. degree in a group called the Committee on Human Development of the University of Chicago; had

previously been a lecturer at Chicago University in a course dealing with symbolic behavior and mass media analysis; had been associate director of a private research firm in Chicago, Social Research, Incorporated, which specialized in the study of mass media for business and media firms; was a fellow of the American Sociological Association, a fellow of the American Psychological Association, of the Society for the Psychological Study of Social Issues, of the Society for the Study of Social Problems, the National Council on Family Relations, and of the Society for the Scientific Study of Sex; had written four books and twenty-four articles concerned with family behavior, family relations, and marital relations; had also traveled extensively in the United States.

Asked for his opinion on national contemporary community standards, Dr. Rainwater testified that "the national standard at this point is one which allows and permits a wide range of subject matter particularly in books. * * * almost any subject matter is acceptable so long as the author's intent can be seen as serious. * * * the standard includes that the author be given the benefit of the doubt; that is, that very few people are willing to condemn an author or a work which they know about unless they are really very sure that his intent was a negative or destructive or unconstructive one." According to Dr. Rainwater, CANDY was "well within" the national standard.

The State made no rebuttal.

The crucial and dispositive question is whether the State met its burden of proving CANDY obscene under present constitutional standards of protection of freedoms of speech and press.

In a Book Named "John Cleland's Memoirs of a Woman of Pleasure" et al. v. Attorney General of the Com. of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1, the United States Supreme Court, in reversing an adjudication of FANNY HILL as obscenity, reviewed its landmark case, Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, and its tests of obscenity, and stated: We defined obscenity in Roth in the following terms: '[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U.S. at 489, 77 S.Ct. at 1311. Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value. * * * Each of the three federal constitutional criteria is to be applied independently." 383 U.S. 1. c. 418, 419, 86 S.Ct. 1. c. 977. See also Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56; Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 969, 16 L.Ed. 2d 31. " '[C]ommunity' * * * in determining standards of decency, does not mean the local area involved but relates to a national standard." State v. Vollmar, Mo., 389 S.W.2d 20, 27 [17], citing Manual Enterprises, Inc. v. Day, 370 U.S. 478, 488, 82 S.Ct. 1432, 8 L.Ed.2d 639; Jacobellis v. State of Ohio, 378 U.S. 184, 195, 84 S.Ct. 1676, 12 L.Ed.2d 793.

"Prurient interest" was defined, Roth v. United States, 354 U.S. 476, 487, fn. 20, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498, as "material having a tendency to excite lustful thoughts"; " * * * Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd," Webster's New International Dictionary (Unabridged, 2d ed.); "A showful or morbid interest in nudity, sex, or excretion, and if it goes beyond customary limits of candor in description or representation of such matters," A.L.I., Model Penal Code, § 207.10(2) (Tentative Draft No. 6,

1957); "patent offensiveness" or "indecency" was defined, Manual Enterprise v. Day, supra, l. c. 482, 82 S.Ct. l. c. 1434, as applying to materials "so offensive on their face as to affront current community standards of decency"; and Jacobellis v. State of Ohio, supra, l. c. 191, 84 S.Ct. l. c. 1680, stated: "It should also be recognized that the *Roth* standard requires in the first instance a finding that the material 'goes substantially beyond customary limits of candor in description or representation of such matters.' This was a requirement of the Model Penal Code test that we approved in Roth, 354 U.S. at 487, n. 20, 77 S.Ct., at 1310 * * *. See Manual Enterprises, Inc. v. Day, 370 U.S. 478, 482–488, 82 S.Ct. 1432, 1434–1438"; "social value" was defined, Roth v. United States, supra, 354 U.S. l. c. 484, 77 S.Ct. l. c. 1309, as applying to "All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests." This was amplified by Jacobellis v. State of Ohio, supra, 378 U.S. l. c. 191, 84 S.Ct. l. c. 1680: "* * * material dealing with sex in a manner that advocates ideas * * * or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a 'weighing' of its social importance against its prurient appeal, for a work cannot be proscribed unless it is 'utterly' without social importance."

Two other tests warrant mention even though they do not appear to have been adopted by majority opinion of the United States Supreme Court: Mr. Justice Stewart in his concurring opinion in Jacobellis v. State of Ohio, supra, 378 U.S. l. c. 197, 84 S.Ct. l. c. 1683, concluded without definition that laws dealing with obscenity "are constitutionally limited to hard-core pornog-raphy." Later, in his dissent in Ginzburg v. United States, supra, 383 U.S. l. c. 498, 86 S.Ct. l. c. 956, he bottomed his reluctance to act in the field of censorship upon an observation: "Censorship reflects a society's lack of confidence in itself. It is a hallmark of an authoritarian regime. Long ago those who wrote our First Amendment charted a different course. They believed a society can be truly strong only when it is truly free. In the realm of expression they put their faith, for better or for worse, in the enlightened choice of the people, free from the interference of a policeman's intrusive thumb or a judge's heavy hand. So it is that the Constitution protects coarse expression as well as refined, and vulgarity no less than elegance. A book worthless to me may convey something of value to my neighbor. In the free society to which our Constitution has committed us, it is for each to choose for himself." In this framework he described materials coming within his test of hard-core pornography as referring to and including "photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with not attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value. All of this material * * * cannot conceivably be characterized as embodying communication of ideas or artistic values inviolate under the First Amendment. * * *" 383 U.S. l. c. 499, fn. 3, 86 S.Ct. l. c. 957. See also dissent of Harlan, J., in Ginzburg v. United States, supra, 383 U.S. l. c. 493, 86 S.Ct. 969. "Pandering," was discussed in Ginzburg v. United States, supra, and in Mishkin v. United States, supra, where the court

held that circumstances of the sale of alleged obscenity was a consideration in determining close cases of alleged obscenity; and that if commercial exploitation is shown, such may support a determination of obscenity, "even though in other contexts the material would escape such condemnation." Ginzburg v. United States, supra, 383 U.S. l. c. 476, 86 S.Ct. l. c. 950.

State v. Vollmar, supra, 389 S.W.2d l. c. 27[18], provides the rule in Missouri for review of obscenity cases as distinguished from other jury cases: "In cases in which fact questions are submitted to a jury, appellate review of the fact issues is ordinarily limited to a determination of whether there was substantial evidence from which the jury could reasonably have found the facts in question. However, we accept the now prevailing view that in obscenity cases the issue for determination is subject to constitutional limitations and the courts are faced with an obligation to make an independent determination of the constitutional issue which cannot be avoided by considering 'obscenity' as a fact question only. See 'Censorship of Obscenity,' 45 Minn. Law Review 114. We will accordingly make our own determination of the mixed question of law and fact as to whether the publications in question are obscene." See Jacobellis v. State of Ohio, supra, l. c. 190, 84 S.Ct. l. c. 1679; Roth v. United States, supra.

In this, as in all criminal cases, the burden is on the State to prove defendant guilty of the offense charged beyond a reasonable doubt; and here that burden is to establish beyond a reasonable doubt that defendant possessed with intent to sell a publication which was obscene and, therefore, not entitled to constitutional protection. The record in this case, tested by the recognized standards, fails to sustain that burden and the judgment of conviction must, therefore, be reversed.

The book itself, its publishers' synopses, and the witnesses' descriptions, show CANDY to be satirical comment on, and a funny spoof of, attitudes toward sex and other matters in present-day society; the evidence also characterized the book as a work of art, stated it to be less candid in comparison to other approved works, showed it to possess literary quality and merit, and that its predominant appeal was not to prurient interest. The prosecution produced no evidence, expert or otherwise, to rebut such showing and, considered test by test, CANDY is not shown to be beyond the pale of constitutional protection. The evidence under each test in fact shows the contrary.

First, the evidence fails to sustain the burden of showing that the predominant appeal of CANDY was to "prurient interest." Dr. Hinton's opinion was that the predominant appeal of CANDY was not to prurient interest; Father Thomas testified that sexual matters can be spoofed in literature without being pornographic or appealing to prurient interest; Dr. Higgins found no violation by CANDY of accepted current national community standards; Dr. Rainwater stated that CANDY was well within such standards. There was no evidence that the book went beyond the national standard; that it had the proscribed effect on anyone, or that it appealed to or stimulated anyone's prurient interest; and the book itself, read as it must be as a whole and without lingering emphasis on isolated passages, Grove Press, Inc. v. Christenberry, 2 Cir., 276 F.2d 433, Haldeman v. United States, 10 Cir., 340 F.2d 59, 62 [6, 7], does not provide such proof.

Second, the evidence fails to sustain the burden of proving CANDY to be "patently offensive," a test amplified to require a finding that the alleged obscenity substantially exceeds customary limits of candor in describing matters. Dr. Hinton felt that TROPIC OF CANCER treated of sexual matters largely for shock value which was not true of CANDY; that CANDY did not go beyond customary limits of candor reflected in other books on the current market; that it was less candid than TROPIC

OF CANCER (not obscene in Grove Press, Inc. v. Gerstein, 378 U.S. 577, 84 S.Ct. 1909, 12 L.Ed.2d 1035); that it did not go further in candor than LADY CHATTERLEY'S LOVER (approved for publication in Grove Press, Inc. v. Christenberry, supra); and that it did not go as far as FANNY HILL (publication permitted by Memoirs v. Com. of Massachusetts, supra). The candor of CANDY was comparable, in his opinion, to that of certain mentioned classics taught in schools. Father Morley described the contemporary national community standard in regard to sex morality as lax or permissive in respect to exposure to sexual matters in communications, particularly literature. Reverend Dudley testified that CANDY was within the scope of the currently accepted attitude toward sex. In the opinion of Father Thomas, the frank and open treatment of sex in current literature was not in conflict with Christian morality. Both Dr. Higgins and Dr. Rainwater testified that the matters portrayed by CANDY were a part of and did not violate the current national standard. There was no evidence that CANDY was patently offensive or indecent, that it exceeded customary limits of candor, or that it violated current national community standards. Candid description and exaggeration of sexual matters is present in the book but, as Mr. Finkel testified, the book loses its purpose and point without such candor; and such description, even though at times utilizing four-letter words, offensive to many, does not render the material obscene. Grove Press v. Gerstein, Inc., supra; Grove Press, Inc. v. Christenberry, supra.

Third, the evidence fails to sustain the burden of showing CANDY to be "utterly without redeeming social value." Even if the book possessed the requisite prurient appeal and patent offensiveness to subject it to proscription under the first two tests, possession of "only a modicum of social value" would preclude a judgment of obscenity. Memoirs v. Com. of Massachusetts, supra, 383 U.S. 1. c. 419, 86 S.Ct. 975. The evidence showed that CANDY had received public acceptance and wide distribution in that six months prior to defendant's arrest 112,000 persons had read and "loved" the book; it was on the St. Louis Post-Dispatch and TIME Magazine best-seller lists for many weeks prior to the arrest; it had been reviewed seriously by literary critics. Mr. Smith testified that he did not consider that he was selling an obscene book; he was aware of its national acclaim and had discussed it with the clientele of the bookstore. Mr. Simpson stated that CANDY had a plot and told a story in an accepted literary sense; that it was a work of art; and that he had recommended it to his students. Dr. Hinton considered CANDY to be a work of literary art and his quoted testimony deals at length with the social value possessed by the book. He, too, had recommended the book to others. Reverend Dudley characterized CANDY as a "healthy antidote" to other kinds of available literature and a healthy addition to the standard of morality. He attributed particular social significance to its lampoon of vicarious sexual experience; he thought CANDY to be an important book. Mr. Finkel emphasized what he thought to be intentional similarities to Voltaire's CANDIDE, a classic satire, through reference to the French quotations from CANDIDE and in the choice of name for the book. He testified that CANDY possessed the usual kind of social importance of any satire; it holds up for ridicule "sexual attitudes highly romantic and sentimental and foolish," which requires candor and exaggeration; it also mocks the soft-headed liberal. Father Thomas was of the opinion that satire and spoofing of sexual matters have social importance, and that he could see no danger in people having freedom to read what they choose. Dr. Higgins also testified that there was no relationship between CANDY and books on sexual perversion and between CANDY and sexual crime and abnormal sexuality, thus rebutting the opinion held by some that erotica produces antisocial sexual conduct. Note again the testimony that CANDY is well within the national

community standard and its favorable comparison to other works, FANNY HILL, TROPIC OF CANCER, LADY CHATTERLEY'S LOVER, also once alleged to be obscene, but, upon trial, found acceptable under the constitutional standards and tests applied here. As with the previous two tests, the State produced no evidence to sustain its burden of proving CANDY to be utterly without redeeming social value; nor did it attempt a rebuttal of defendant's evidence of CANDY's social value; and the book itself tells a story of a principal character's problems in a literary sense. Respondent concedes, even, that the authors of CANDY are recognized literary figures and that the book might be said to be well written, it being respondent's position that "well written obscenity is still obscene." The difficulty with that position is that respondent tendered no proof in satisfaction of its burden to prove such assumed obscenity.

Respondent cites Books, Inc. v. United States, 1 Cir., 358 F.2d 935, a conviction of a book entitled LUST JOB as obscene.[1] That case contains an exception which leaves it without point here, in that "there is evidence which was absent in (Memoirs v. Massachusetts, supra [and in this case]) 'that the book was commercially exploited for the sake of prurient appeal, to the exclusion of all other values,'" 358 F.2d l. c. 938, thus raising a true jury issue on alleged obscenity.

If there is a "hard-core pornography" test, it may be passed quickly in that respondent does not urge any consideration of its case by that test, and the only evidence on this came from Mr. Simpson and Mr. Finkel that CANDY was neither pornographic nor hard-core pornography.

The "pandering" test also may be summarily dismissed because, in the language of respondent's brief, "the state did not at the trial, and does not now rely on evidence of 'pandering,'" and there was no evidence of advertising or improper use of the book within the purview of "pandering."

Respondent argues that this conviction should be affirmed on the theory that it is not necessary for the prosecution to produce expert testimony on the various standards, and that the only evidence necessary to show obscenity of CANDY was the book itself. The first part of this contention overlooks the State's burden to prove its case beyond a reasonable doubt whether by expert testimony or otherwise. On the whole point, respondent relies on State v. Vollmar, supra, and State v. Becker, 364 Mo. 1079, 272 S.W.2d 283, both of which are distinguishable in that State v. Vollmar held on the authority of State v. Becker only that the trial court did not abuse its discretion in refusing defendant's offered expert testimony on community standards and on whether the material was in fact obscene, the ultimate issue for the jury's determination. See State v. Vollmar, supra, 389 S.W.2d l. c. 29–30 [25]; State v. Becker, supra, 272 S.W.2d l. c. 287 [5]. It should be noted that both those cases, instead of a written literary work such as CANDY, dealt only with pictorial and photographic matter, the obscene nature of which was patent on its face. See description of those materials in State v. Vollmar, supra, l. c. 28–29 [21] and State v. Becker, supra, 272 S.W.2d l. c. 285 [1]. "Opinion testimony ordinarily is not received where the trier of the facts is as capable as the witness of drawing conclusions from the facts proved," Schmitt v. Pierce, Mo., 344 S.W.2d 120, 128 [6]; and, in the case of obscene pictures, a juror "is as capable of judging a publication as an alleged expert," State v. Vollmar, supra, 389 S.W.2d l. c. 30 [25].

United States v. Klaw, 2 Cir., 350 F.2d 155, contains many parallels and is in point with this case. Defendant, as the owner of

1. Although it had not occurred when Judge Higgins wrote the above, this case has since been reversed by the United States Supreme Court, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311.

Nutrix Company, an establishment that printed and published stories, photographs, and drawings, was convicted of mailing obscene matter. His materials contained photographs or crude drawings of females —"some scantily clad, some tightly trussed, and all voluptuous—subjecting other men and women to various tortures and indignities." They "bore such titles as 'Sorority Girls Stringent Initiation,' * * * 'Men in the Ladies Room,' and the like." All of these materials are described as "sado-masochistic" with reference to Krafft-Ebing's *Psychopathia Sexualis* for further elucidation. Such materials are pictorial and thus comparable to the materials described in State v. Vollmar and State v. Becker, supra, and are a contrast to the written literary format of CANDY. As in CANDY's case, the prosecution rested its case on exhibits consisting of the materials themselves, of which the court said: "It may be conceded that the 'sado-masochistic' trash disseminated by Nutrix is not artistic or aesthetically pleasing. Nor is any claim made that it has any redeeming literary or social value whatsoever." 350 F.2d 1. c. 160 [1]. That court then proceeded, 350 F.2d 1. c. 164–165 [5–7], to review the same constitutional tests and cases treated here, and to reverse the conviction. The language of Judge Moore's conclusions is appropriate to this disposition: "* * * (j)urors should not consider their own personal reactions as setting the standard; there is too much truth in the observation that 'what is pornography for one man is the laughter of genius to another.' * * * the only predicate for any conclusion about prurient appeal was the material itself, as if *res ipsa loquitur*. The jurors were, therefore, left to speculate. They were invited to behold the accused material and, in effect, conclude simply that it is undesirable, it is distasteful, it is disgusting. * * * Because the jury was given no basis for understanding exactly how and why the material appeals to its audience, whether deviate or average person, it may too readily supply an explanation—'prurient appeal.' * * * Too

easily the jury could aid suppression simply on the basis of speculations and suspicions about the prurient appeal of material to some unknown, undefined person whose psyche is not known. With the First Amendment in the background, this cannot be abided. The state of the record gave the jurors impermissibly broad freedom to convict just because, having no more informative evidence than the material itself, they might think that the average person would 'recognize' that the material has prurient appeal. But again, *to whom*? * *. * it is the record and not our feelings that must control. Here the jury had no opportunity to judge the exhibits presented to them by any standard other than their own speculation as to 'prurient interest.' If they knew the standard set as a matter of law by other cases, their result might have been different. 'Due process of law' would be a meaningless cliche if the nonsensical trash that is the subject of this prosecution were allowed to be the basis of a conviction by judge or jury without any proof demonstrating that it has the proscribed effect on any of our citizenry. * * * While there is some merit to the opinion of those who say that appellate courts should not have to sit as a board of censors supervising the work of the police, the motion picture censorship bureaus, the schools, the churches, and the other organizations that have their lists of good and bad books and motion pictures, there is even more merit to the view that once these preferences are enforced upon others, we 'cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected.' * * Unless there be this protection, a witch hunt might well come to pass which would make the Salem tragedy fade into obscurity. Having in mind the alternatives of jail or freedom, courts must be aware of the facts of the 'held-not-to-be-obscene' or 'approved' cases, and ensure that the proof is sufficient to allow a fact finder to set this case apart from them. Otherwise it would be altogether too easy for any prosecutor to

stand before a jury, display the exhibits involved, and merely ask in summation: 'Would you want your son or daughter to see or read this stuff?' A conviction in every instance would be virtually assured." 350 F.2d l. c. 167–170 [12, 13]. What is said there as to the burden of proof necessary to establish "prurient appeal" applies with equal force to the burden of proof of "patent offensiveness," "utter lack of redeeming social value," "hard-core pornography," and "pandering." See also United States v. 392 Copies of Magazine "Exclusive," D.C. Md., 253 F.Supp. 485, 493, where the court agreed with United States v. Klaw, supra, as to the need of evidence in addition to the alleged obscenity itself unless the elements of appeal to prurient interest, patent offensiveness, and utter lack of redeeming social importance were obvious on the face of the material as was the case of the pictorial nude material there reviewed; and see also United States v. West Coast News Co., 6 Cir., 357 F.2d 855, 859 [4], where both prosecution and defendant availed themselves of expert witnesses on the issue of obscenity.

Respondent recognizes that United States v. Klaw, supra, held that a "jury was not capable of applying the tests and determining whether materials were obscene" without evidence other than the alleged obscenity itself, but would avoid the impact of this authority by saying only that this is not the rule in Missouri, citing State v. Vollmar and State v. Becker, previously distinguished. Respondent also mentions Kahm v. United States, 300 F.2d 78, of which suffice to say that it preceded United States v. Klaw in time by more than three years and was prior as well to the citation and distinction of United States v. Klaw in Mishkin v. State of New York, supra, 383

U.S. l. c. 510, 86 S.Ct. l. c. 964, where a conviction based on obscenity was affirmed because "[n]ot only was there proof of the books' prurient appeal, * * * but the proof was compelling."

Finally, the United States Supreme Court in Redrup v. New York, 386 U.S. 767, 87 S. Ct. 1414, 18 L.Ed.2d 515, May 8, 1967, decided that distribution of two paperback books, Lust Pool and Shame Agent, two magazines, High Heels and Spree, and eight magazines, Gent, Swank, Bachelor, Modern Man, Cavalcade, Gentleman, Ace, and Sir, all allegedly obscene, "is protected by the First and Fourteenth Amendments from governmental suppression, whether criminal or civil, *in personam* or *in rem*." In reversing convictions for publication of these materials as alleged obscenity, the court reviewed its tests for obscenity as summarized in a book named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Com. of Massachusetts, supra, 383 U.S. l. c. 418–419, 86 S. Ct. l. c. 977, and held that "[w]hichever of these constitutional views is brought to bear upon the cases before us, it is clear that the judgments cannot stand." A fortiori, if these are protected publications under the First and Fourteenth Amendments, CANDY merits the same protection and it cannot serve as the subject matter of an obscenity prosecution.

Since the above was written by Judge Higgins, there have been two other developments:

First, the United States Supreme Court on June 12, 1967, handed down eleven decisions, in each of which the Court granted certiorari and summarily reversed obscenity convictions, citing the Redrup case, supra, as authority.[2]

2. Schakman v. California, 388 U.S. 454, 87 S.Ct. 2107, 18 L.Ed.2d 1316 (1967); Mazes v. Ohio, 87 S.Ct. 2105, 18 L.Ed. 2d 1315 (books); Books, Inc. v. United States, 388 U.S. 449, 87 S.Ct. 2098, 18 L.Ed.2d 1311, 388 U.S. 453 (books; reversing 1st Cir.); Aday v. United States, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (books; reversing 6th Cir.); Avansino v. New York, 388 U.S. 447, 87 S.Ct. 2093, 18 L.Ed.2d 1308 (books); Sheperd v. New York, 388 U.S. 444, 87 S.Ct. 2093, 18 L. Ed.2d 1306 (books); Cobert v. New York, 388 U.S. 443, 87 S.Ct. 2092, 18 L. Ed.2d 1305 (movies); Ratner v. California, 388 U.S. 442, 87 S.Ct. 2092, 18 L.Ed.

Second, the Supreme Court of Pennsylvania in a seven to two decision handed down September 29, 1967, Commonwealth v. Dell Publications, Inc., Pa., 233 A.2d 840, has ruled that "Candy", under both Redrup, supra, and Roth v. United States—Memoirs v. Massachusetts, supra, tests is not constitutionally obscene. The observations of the Pennsylvania court on the Redrup decision and the other eleven decisions are worth quoting here, as follows [footnotes omitted]:

"On May 8, 1967, without the fanfare of its 1966 trilogy, the Court handed down a cryptic per curiam opinion disposing of three consolidated cases, Redrup v. State of New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515, which may yet prove to be the most significant of its obscenity opinions. The impact of this opinion, along with those cases summarily decided on the last day of the Term, comes as close to a holding that, in the eyes of the present Court, 'Candy' is not per se constitutionally obscene as is possible without a direct ruling on the book itself. Although the Court had originally granted review in Redrup to consider problems of *scienter* upon the assumption that the materials involved were obscene in the constitutional sense, it decided to dispose of the case upon the ground that they were not obscene under the first and fourteenth amendments. The Court noted that while it was badly split concerning the precise definition of obscenity, each of the seven justices who reached the merits agreed that under their individual approaches the materials were not legally obscene. * * *

"*Redrup* seems to signify the Court's final abandonment of its futile search for a definition of obscenity *vel non*. For significantly, instead of attempting to determine what constituted obscenity, the Court approached the problem in terms of those circumstances under which the publication of otherwise unobjectionable material might be constitutionally restricted, 87 S.Ct. at 1415:

'In none of the cases was there a claim that the statute in question reflected a specific and limited state concern for juveniles. See Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; cf. Butler v. State of Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412. In none was there any suggestion of an assault upon individual privacy by publication in a manner so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it. Cf. Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233; Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068. And in none was there evidence of the sort of "pandering" which the Court found significant in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31.'

"As has already been indicated in this opinion, none of the three situations described in *Redrup* are present in the case at bar. The importance of *Redrup* to obscenity litigation in general, and to the instant case in particular, is amply demonstrated by eleven decisions handed down by the Court on the last day of the 1966 Term, June 12, 1967. In each case the Court granted certiorari and summarily reversed an obscenity conviction citing *Redrup* as its sole authority. In other words, none of the materials involved in these litigations was, in the Court's view, obscene in the constitutional sense. * * *[3]

* * * * * *

2d 1304 (movies); Friedman v. New York, 388 U.S. 441, 87 S.Ct. 2091, 18 L. Ed.2d 1303 (books); Keney v. New York, 388 U.S. 440, 87 S.Ct. 2091, 18 L.Ed.2d 1302 (books); A Quantity of Books v. Kansas, 388 U.S. 452, 87 S.Ct. 2104, 18 Ed.2d 1314 (books).

3. In a footnote the Pennsylvania court said this about these eleven cases: See 35 Law Week 3430–31 (June 13, 1967) for a summary of the issues raised in the cases cited notes 41 and 42 supra. Examples of the paperbacks held not to be obscene in the constitutional sense are:

"None of the published works involved in the *Redrup* related cases comes close to having achieved the national recognition afforded 'Candy.' Indeed, to our knowledge, none of them were reviewed in any publication and none certainly appeared on any best seller lists. Moreover, the reported opinions of the lower courts indicate that no serious attempt was made to defend them on the ground of redeeming social importance. We can only conclude therefore that under both *Redrup* and the *Roth-Memoirs* test the court below erred in finding 'Candy' constitutionally obscene."

In my opinion, the foregoing further strengthens the view that "Candy" is not constitutionally obscene on the facts before us and that the judgment of conviction herein should be reversed outright.

"Lust Job", "Orgy Club", "Sex Life of A Cop", "Passion Priestess", and "Sin Warden." See especially the description of "Sex Life of A Cop" in United States v. West Coast News Co., 357 F.2d 855, 857–858 (6th Cir. 1966), rev'd sub nom, Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967) * * *."